The NATIONAL WILDLIFE FEDERA-TION et al., Plaintiffs–Appellants,

v.

Brock ADAMS et al., Defendants–Appellees.

No. 79–4223.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 11, 1980.

Decided Oct. 2, 1980.

Ronald A. Franz, Port Orchard, Wash., Roger M. Leed, Seattle, Wash., Terence Thatcher, Washington, D.C., for plaintiffs—appellants.

Nancy B. Firestone, Washington, D.C., Charles F. Secrest, Olympia, Wash., for defendants—appellees.

Before KENNEDY and HUG, Circuit Judges, and WILLIAMS *, District Judge.

HUG, Circuit Judge:

This is an appeal from an order of the district court denying appellants' motion for a preliminary injunction to restrain further construction of two highway segments approved for federal funding in connection with the Trident Submarine Base located in Bangor, Kitsap County, Washington.[1] The issues on appeal are whether the appellees complied with provisions of: (1) Executive Order 11,990, 42 Fed.Reg. 26,961 (1977), which is titled "Protection of Wetlands"; (2) the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321–4369; and, (3) section 608 of the Military Construction Act of 1975, Pub.L.No. 93–552, 88 Stat. 1745, 1763 (1974), which authorizes the use of federal funds to assist communities near the Bangor Trident site in meeting the cost of providing increased services and facilities for residents of the area. The district court found that appellees had complied with all the statutory requirements. The district court refused to enjoin the construction, concluding that appellants had not shown a probability of success on the merits, and that the public interest would suffer far more serious harm if an injunction were issued than would appellants if it were not. We affirm.

I

One of the primary problems anticipated as a result of the construction of the Trident Base at Bangor, with the concomitant population increase, was the lack of a transportation network sufficient to provide access to the base.[2] Two highway projects are involved in the present dispute. One project is the proposed new 8.14 mile section of State Route 3 (SR–3). The existing section of SR–3, which is presently a two-lane road, and is the main north–south route through Kitsap County, will be replaced by a controlled–access highway with two lanes in each direction. This new highway will run from the Clear Creek Road Interchange near Silverdale to the existing SR–3 near Poulsbo. The route selected for this new highway, known as the T–5 alternative, runs through the Clear Creek Valley to the west of the present section of SR–3. The second proposed improvement challenged in this appeal, the Bucklin Hill Bypass, is a county road which will connect to the new SR–3 at the Clear Creek Road

---

* The Honorable Spencer Williams, United States District Judge for the Northern District of California, sitting by designation.

1. The appellants include the National Wildlife Federation, Friends of the Earth, Inc., and Citizens for Alternatives to Freeways, three environmental groups who have shown longstanding concern for the protection of the environment, and several residents of Kitsap County whose land will be directly affected by construction of the highway.

   The appellees include the federal officials responsible for approval and funding of the highway, the Department of Transportation of the State of Washington, and Kitsap County.

2. A thorough discussion of the planning and environmental assessments involved in construction of the base itself may be found in

Interchange and provide service to Silverdale.[3]

The principal environmental concerns raised by the appellants relate to the effect of SR–3 on wetlands and agricultural land. Specifically, appellants contend that appellees have not complied with the mandate of Executive Order 11,990 of strict protection of wetlands, and that the effect of SR–3 upon such lands was not adequately described in the Draft Environmental Impact Statement (DEIS). In addition, appellants contend that the Department of Defense is providing a larger amount of funding for the SR–3 and Bucklin Hill Bypass projects than is permitted by section 608.

## II

This case was originally filed on November 3, 1978 in the United States District Court for the District of Columbia. On January 31, 1979 a preliminary injunction was entered preventing any action on SR–3 until February 20, 1979; this injunction was later extended to March 9, 1979. A motion to change venue to the Western District of Washington was granted. The State of Washington was granted leave to intervene on February 2, 1979, and Kitsap County was granted such leave on February 9, 1979.

On March 8, 1979, a hearing was held on appellants' renewed motion for a preliminary injunction. The district court issued a memorandum opinion and order denying injunctive relief and entered judgment on March 13, 1979. This appeal followed.

## III

Our review on an appeal from denial of a preliminary injunction is limited to determining whether the district court has "abused its discretion or based its decision upon an erroneous legal standard or clearly erroneous finding of fact." *City of Anaheim, California v. Kleppe*, 590 F.2d 285, 288 n. 4 (9th Cir. 1978); *Sierra Club v. Hathaway*, 579 F.2d 1162, 1167 (9th Cir. 1978). In recent cases this court has approved a tripartite test for determining the propriety of injunctive relief:

(1) Have the movants established a strong likelihood of success on the merits? (2) Does the balance of irreparable harm favor the movants? (3) Does the public interest favor granting the injunction?

*Warm Springs Dam Task Force v. Gribble*, 565 F.2d 549, 551 (9th Cir. 1977); *Sierra Club v. Hathaway*, 579 F.2d at 1167.[4]

The district court, in denying the injunction in the present case, correctly considered these factors. The court found that the appellants had not shown a strong likelihood of success on any of their claims, and that the public interest would "suffer far more serious harm" if injunctive relief were granted than would appellants if it were not. We agree with the district court's evaluation.

## IV

Appellants argue that the selection of the T–5 route did not comply with the directive of Executive Order 11,990 that each federal agency shall avoid undertaking or providing assistance for new construction in wetlands. unless there is "no practicable alternative to such construction."[5] Appellants contend

---

*Concerned About Trident v. Rumsfeld*, 555 F.2d 817 (D.C. Cir. 1977).

**3.** The claims relating to this aspect of the project relate solely to the propriety of the funding under section 608.

**4.** We have commented extensively on this three-fold test as compared to the test enunciated in *William Inglis & Sons Baking Co. v. ITT Continental Banking Co.*, 526 F.2d 86, 88 (9th Cir. 1975). *See City of Anaheim, California v. Kleppe*, 590 F.2d at 288 n. 4; *Sierra Club v. Hathaway*, 579 F.2d at 1167 n. 7. For purposes of this opinion it does not matter which stan-

dard we adopt, for appellants have failed to establish entitlement to relief under either.

**5.** In pertinent part, Executive Order 11,990 provides:

[I]n order to avoid to the extent possible the long and short term adverse impacts associated with the destruction or modification of wetlands and to avoid direct or indirect support of new construction in wetlands wherever there is a practicable alternative, it is hereby ordered as follows:

Section 1. (a) Each agency shall provide leadership and shall take action to minimize

that there was an inadequate search for alternatives to the T–5 route, pointing to at least three alternatives they allege are preferable to T–5 in terms of impact on wetlands. The district court found that the Federal Highway Administration (FHWA) did construe its authority consistently with the Order and reasonably made the determination therein mandated.

Appellants analogize Executive Order 11,990 to section 4(f) of the Department of Transportation Act of 1966, as amended, 49 U.S.C. § 1653(f), and section 18(a) of the Federal–Aid Highway Act of 1968, 23 U.S.C. § 138, as amended. The language of these statutes protecting public parks is similar though not identical to that of Executive Order 11,990.[6] The two statutes provide that the Secretary of Transportation "shall not approve" any project which requires use of park land unless "there is no feasible and prudent alternative." The Executive Order provides that each agency "shall avoid undertaking or providing assistance for new construction located in wetlands unless the head of the agency finds . . . that there is no practicable alternative to such construction . . . ." The Executive Order also adds a sentence on making the determination of practicability not contained in the two statutes: "In making this finding the head of the agency may take into account economic, environmental and other pertinent factors."

It is apparent that the language of the statutes is more restrictive than Executive Order 11,990. The statutes *prohibit* approval absent a finding of no feasible alternative, whereas Executive Order 11,990 states that the use of wetlands is to be *avoided* absent a finding of no practicable alternative. Furthermore, the agency, under Executive Order 11,990, is expressly allowed to take into account economic, environmental and other pertinent factors.

The Supreme Court has held that the two statutes permit the construction of highways through park lands only in "the most unusual situations," specifically, "where alternative routes present unique problems." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 411–13, 91 S.Ct. 814, 822, 28 L.Ed.2d 136 (1971).

We have no doubt that Executive Order 11,990 extends a broader protective aura to wetlands than would NEPA standing alone. We conclude, however, that the Order does not go so far as the statutes discussed in *Overton Park*. The wording of the Executive Order is less prohibitive and contemplates more balancing of other factors than the statutes at issue in *Overton Park*. The test for determining whether an alternative propounded by agencies promulgating regulations under Executive Order

---

the destruction, loss or degradation of wetlands, and to preserve and enhance the natural and beneficial values of wetlands in carrying out the agency's responsibilities for . . . providing Federally undertaken, financed, or assisted construction and improvements; . .

. . . . .

Section 2. (a) In furtherance of Section 101(b)(3) of the National Environmental Policy Act of 1969 (42 U.S.C. § 4331(b)(3)) to improve and coordinate Federal plans, functions, programs and resources to the end that the Nation may attain the widest range of beneficial uses of the environment without degradation and risk to health or safety, each agency, to the extent permitted by law, shall avoid undertaking or providing assistance for new construction located in wetlands unless the head of the agency finds (1) that there is no practicable alternative to such construction, and (2) that the proposed action includes all practicable measures to minimize harm to wetlands which

may result from such use. In making this finding the head of the agency may take into account economic, environmental and other pertinent factors.

**6.** The relevant language in 23 U.S.C. § 138 and 49 U.S.C. § 1653(f) provides:

[T]he Secretary shall not approve any program or project which requires the use of any publicly owned land from a public park, recreation area, or wildlife and waterfowl refuge of national, State or local significance as determined by the Federal, State, or local officials having jurisdiction thereof, or any land from an historic site of national, State, or local significance as so determined by such officials unless (1) there is no feasible and prudent alternative to the use of such land, and (2) such program includes all possible planning to minimize harm to such park, recreational area, wildlife and waterfowl refuge, or historic site resulting from such use.

.

11,990 is practicable is whether it is capable of attainment within relevant, existing constraints.[7]

Our review of the decision of the head of the agency is limited to determining whether the choice is "arbitrary, capricious, [or] an abuse of discretion" under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). *Overton Park*, 401 U.S. at 416, 91 S.Ct. at 823.

> To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

*Id.* (citations omitted).

After issuance of the DEIS, in response to extensive comments received by the FHWA from the United States Fish and Wildlife Service (FWS), the FHWA undertook a study in order to determine if the mandate of Executive Order 11,990 had been met.[8] A biology report was prepared, entitled "Wetlands on the Trident Base Access Study Area," which carefully examined the impact of SR–3 on wetlands and the impact on wetlands of alternatives discussed in the DEIS. This study classified as wetlands much of the land previously identified as pastureland in the DEIS. After reviewing all the relevant information, the FHWA, on March 20, 1978, issued a "Wetlands Determination." This report concluded that there was no practicable alternative to T–5 under Executive Order 11,990, and, in addition, set forth measures to mitigate the impact of T–5 on wetlands as required by the Order.[9]

█ The evidence supports the agency's decision and the district court's findings, and refutes appellants' contentions that practicable alternatives were not adequately considered. The T–6 alternative proposed by appellant Petersen was considered, and, in fact, comes within the same corridor studied in relation to the T–3A alternative. This alternative was rejected because it was determined that it would actually cause greater harm to the environment, while not providing adequate access to the base.

The two other alternatives proposed by appellants, improvement of Clear Creek Road or improvement of Central Valley Road, also have fatal deficiencies. Neither would sufficiently alleviate the central problem—the accommodation of the increased traffic due to the establishment of the base. In addition, improvement of these routes would promote increased development along their paths, which would be socially and environmentally more damaging. The record also indicates that a study of mass transit feasibility was conducted with negative results. As the district court found, appellees considered the following subjects in assessing the impact of the T–5 route: commerce, industry, urban development, land use, farming, employment, taxa-

7. Definitions set forth by different agencies may be found at 43 Fed.Reg. 6032 (1978) (Water Resources Council); 44 Fed.Reg. 1456 (1979) (Environmental Protection Agency); 44 Fed.Reg. 20473 (1979) (Economic Development Administration); 10 C.F.R. § 1022.4(p) (Department of Energy). Each of these definitions recognizes that Executive Order 11,990 allows consideration of environmental, technological, legal, and financial factors. Of course, present unavailability of sufficient financial resources to implement either alternatives or mitigative measures cannot be used as the sole, or even the major determinant to a finding of impracticability.

8. There is no question that the guidelines of the Order apply to the SR–3 project. Section 8 of the Order states that it shall be implemented by each agency by October 1, 1977, but that it is not applicable to projects for which a draft or final EIS is filed before October 1, 1977. The DEIS of SR–3 was not filed until October 14, 1977, and the final EIS was not filed until April 18, 1978.

9. The FWS approved the mitigative measures as ameliorating its earlier objections. A review of the record reveals that FHWA adequately considered various alternatives to minimize the impact of the project on wetlands. *Cf. Louisiana Environmental Society, Inc. v. Coleman*, 537 F.2d 79, 85–87 (5th Cir. 1976) (failure to adequately consider mitigative measures requires remand).

tion, vegetation, wildlife, water, energy, traffic, transportation, visual and air quality, noise, and solid waste. Such a comprehensive review clearly meets the requirements of Executive Order 11,990.

In sum, we conclude that the appellees adequately and in good faith complied with Executive Order 11,990. Comprehensive studies were conducted and many factors considered in attempting to alleviate a serious problem. The decision to use route T–5 is supported by the record and is not arbitrary, capricious or an abuse of discretion. We therefore affirm the finding of the district court on this issue.

V

Appellants contend that the DEIS was so deficient in its discussion of the impact of the project on wetlands that it could not serve as a meaningful basis for preparation of the Final Environmental Impact Statement (FEIS). Appellants assert that circulation of such an inadequate DEIS frustrated the requirement that other agencies be consulted and the public allowed an opportunity for comment. Appellants claim that if the true extent of the effect of T–5 on wetlands were revealed, much different comments would have been received.

■ The "question whether an EIS complies with the requirements of NEPA [is] a procedural question, governed by § 706(2)(D) [of the Administrative Procedure Act]." *Lathan v. Brinegar*, 506 F.2d 677, 693 (9th Cir. 1974) (en banc). Agencies must follow the procedures established by NEPA in preparing an EIS. *Id.* "Circulation of a grossly inadequate statement as the draft of [an FEIS] could conceivably frustrate the goal of obtaining informed agency and public comment on the environmental consequences of a proposed project, and in some circumstances this could amount to a violation of the responsible agency's duty" under NEPA. *Id. See also Warm Springs Dam Task Force v. Gribble*, 621 F.2d 1017, 1022–1023 (9th Cir. 1980).

■ It is true that the DEIS indicated that only 5 acres of wetlands would be removed by T–5. The final EIS states that the T–5 alternative will actually affect 38 acres directly, and another 51 acres to varying degrees. The district court found, however, that this deficiency in the DEIS "did not deprive any interested agency or the public of notice or the opportunity to comment thereupon."

We are satisfied that the effects described in the DEIS were sufficient to allow comment by all interested parties. In fact, the difference between the acreage figures in the DEIS and the FEIS is principally in nomenclature. The DEIS referred to affected marshes, streams, flooded pastures, and wetlands. Subsequently, in the "Wetlands Determination" prepared pursuant to Executive Order 11,990, these areas came within the definition of wetlands. The description of the nature of these areas in the DEIS was sufficient to allow informed comment. Indeed, the Fish and Wildlife Service sent extensive comments expressing its concern. This acreage was incorporated in the definition of wetlands contained in the final EIS, thus completing the refinement of this definitional process.[10]

Appellants' argument that the effects of T–5 on farmland were inadequately described in the DEIS likewise is not persuasive. The DEIS addressed the effects of T–5 on various specific farms and other acreage that was clearly farmland. Again, differences in the FEIS were principally a matter of definitional refinement.

Under these circumstances, we cannot say that the DEIS was so grossly deficient as to frustrate the opportunity for comment. To the contrary, as the district court found, the DEIS was sufficiently detailed to afford a meaningful opportunity to comment. This resulted in a comprehensive FEIS which was both sufficiently detailed to aid in the substantive decision and to make available to the public information

---

**10.** Appellants do not challenge the adequacy of the discussion in the FEIS concerning wetlands and agricultural lands; they challenge only the DEIS. Nor do appellants contend that the DEIS was not circulated to appropriate agencies or was not available to the public.

about the environmental impact of the proposed action. *Trout Unlimited v. Morton*, 509 F.2d 1276, 1283 (9th Cir. 1974).

## VI

Appellants' final contention is that the funding for SR–3 and the Bucklin Hill Bypass is being provided by the Department of Defense in a manner not permitted by section 608 of Pub.L. No. 93–552.[11] Section 608 authorizes the Secretary of Defense to assist communities located near the Trident Base in meeting the cost of providing increased municipal services and facilities to the residents of those communities. Section 608(a) sets forth the criteria for determining the eligibility of communities for such impact funds and section 608(c) provides for the method of determining the amount of impact funds to be made available to any local community for any community service or facility.[12]

In accordance with Section 608, the Secretary of Defense determined that the State of Washington and Kitsap County would be entitled to approximately $22 million in impact funds for improving roads in the area of the Trident Base. It is not this finding the appellants challenge, but rather the decision of the Secretary to allocate a large portion of these impact funds to two high priority projects, rather than distribut-

11. The district court assumed without deciding that the plaintiffs had standing to assert this claim, and then decided it on the merits.

We address the standing issue to determine if we have jurisdiction before reaching a decision on the merits.

The essence of the standing inquiry is whether the parties seeking to invoke the court's jurisdiction have "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult . . . questions." *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 72, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978), *quoting Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). The test for whether appellants have standing is two–pronged: (1) there must be a "distinct and palpable injury" to the plaintiff; and, (2) there must be " 'fairly traceable' causal connection between the claimed injury and the challenged conduct." *Duke Power*, 438 U.S. at 72, 98 S.Ct. at 2630. (citations omitted).

The individual appellants in this case will clearly suffer harm to their land if the SR–3 project goes forward. Appellees have argued that the section 608 funds are necessary for completion of the project, because sufficient additional funding is not presently available from other federal agencies or State or local sources. Thus, if this court were to grant the requested relief, the project would not proceed. The individual appellants therefore have standing to bring the challenge to the manner of funding. Having reached this conclusion, we need not consider whether the three environmental groups are proper parties, *compare Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972) (plaintiff lacked standing because it alleged no individualized injury) *with United States v. SCRAP*, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973) (plaintiffs alleged specific injury and thus had standing), for their "presence or absence makes no material difference to either our consideration of the merits of the controversy or to our authority to award the requested relief." *Duke Power*, 438 U.S. at 72, n.16, 98 S.Ct. at 2630, n.16.

12. Section 608 provides in subsections (a) and (c):

(a) The Secretary of Defense is authorized to assist communities located near the TRIDENT Support Site Bangor, Washington, in meeting the costs of providing increased municipal services and facilities to the residents of such communities, if the Secretary determines that there is an immediate and substantial increase in the need for such services and facilities in such communities as a direct result of work being carried out in connection with the construction, installation, testing, and operation of the TRIDENT Weapon System and that an unfair and excessive financial burden will be incurred by such communities as a result of the increased need for such services and facilities.

(c) In determining the amount of financial assistance to be made available under this section to any local community for any community service or facility, the Secretary of Defense shall consult with the head of the department or agency of the Federal Government concerned with the type of service or facility for which financial assistance is being made available and shall take into consideration (1) the time lag between the initial impact of increased population in any such community and any increase in the local tax base which will result from such increased population, (2) the possible temporary nature of the increased population and the long–range cost impact on the permanent residents of any such community, and (3) such other pertinent factors as the Secretary of Defense deems appropriate.

ing the funds to be used for each specific roadway project affected by the Trident Base. The Secretary, in conjunction with local officials, has determined to allocate $13.1 million toward the construction of the first stage of SR–3, which will cost about $27.6 million,[13] and to allocate $7.5 million for the entire cost of the construction of the Bucklin Hill Bypass. It is this pooling of the impact funds for the construction of these highway projects that appellants contend violates the provisions of section 608. The district court found that the Secretary's approval of the level of funding for these projects, and the pooling of funds beyond the precise Trident–related percentage of SR–3 and Bucklin Hill Bypass expenditures, is not a violation of federal law, so long as the Secretary's funding of those projects does not exceed the total Trident–related share of the overall cost of improving state and federal roads. We agree.

The Secretary, after determining the eligibility of local communities to receive impact funds under section 608(a), is given broad discretion under section 608(c) to determine the amount of impact funds available for any project within a given service category. In determining the amount of financial assistance to be made available to any local community for a service or facility, the Secretary is required under section 608(c) to take into consideration:

(1) the time lag between the initial impact of increased population in any such community and any increase in the local tax base which will result from such increased population;

(2) the possible temporary nature of the increased population and the long–range cost impact on the permanent residents of any such community; and

(3) such other pertinent factors as the Secretary of Defense deems appropriate.

In evaluating the various highway improvements necessitated by the Trident Base, the Secretary concurred with the decision of local officials that the most pressing need was for the construction of the major arteries to carry the bulk of the traffic between the Trident Base and the local communities. There is no prohibition in section 608 precluding the pooling of impact funds, nor is there any requirement that the funds be parcelled out to each specific project in proportion to the impact of Trident on that project. The Secretary is required under section 608(c) to consider the time lag between the initial impact of increased population in the community and any increased tax base which would result. It is a reasonable conclusion that it would be best to utilize impact funds to construct the major arteries and leave the local peripheral roadways to be constructed at a later date when the tax base of the local communities has increased. Moreover, the Secretary is to take into consideration under section 608(c)(3) "such other pertinent factors as the Secretary of Defense deems appropriate." The more pressing need for the major arteries would certainly be a pertinent factor to be taken into consideration in allocating the impact funds and would be well within the authority conferred by section 608.

## VII

We conclude that in the present case the provisions of NEPA and Executive Order 11,990 were fully complied with by all involved agencies and that the pooling of the impact funds for the construction of SR–3 and the Bucklin Hill Bypass was within the authority of the Secretary of Defense.

The judgment of the district court is AFFIRMED.

---

**13.** The state is providing $1 million of the additional funding for the first stage of SR–3 and the remaining $13.5 million is being provided from the Department of Transportation as defense access funding pursuant to 23 U.S.C. § 210. The total cost of the entire new SR–3 highway will be approximately $40 million.