[No. 13566–3–II.   Division Two.   November 14, 1990.]

PUGET SOUND WATER QUALITY DEFENSE FUND, ET AL,
*Petitioners,* v. MUNICIPALITY OF METROPOLITAN
SEATTLE, ET AL, *Respondents.*

*Michael W. Gendler* and *Bricklin & Gendler,* for petitioners Puget Sound Water Quality Defense Fund, et al.

*Robert E. Mack* and *Smith Alling & Lane,* for petitioner Washington Environmental Council.

*Robert D. Johns* and *Reed McClure Moceri Thonn & Moriarty,* for petitioner Legal Advocates for Washington.

*Robert B. Mitchell, Thomas E. Backer,* and *Preston Thorgrimson Shidler Gates & Ellis,* for respondent Metro Seattle.

*Mark H. Sidran, City Attorney,* and *Judith B. Barbour, Assistant,* for respondent City of Seattle.

*Richard A. Dubey* and *The Dubey Law Firm,* for respondent Citizens To Save Interbay.

ALEXANDER, C.J.—The Puget Sound Water Quality Defense Fund, Legal Advocates for Washington and the Washington Environmental Council appeal the Shorelines Hearings Board's affirmance of a decision of the Seattle City Council to issue a permit to the Municipality of Metropolitan Seattle (Metro) for the construction of a secondary sewage treatment plant at West Point. Petitioners argue that the Board (1) misconstrued the term "no feasible alternative" set forth in the Seattle Shoreline Master Program and that this led it to wrongfully determine that feasible, nonshoreline alternatives to the West Point proposal do not exist; (2) failed to consider the policies of the Shoreline Management Act and Seattle's Shoreline Master Program and determine that the West Point plan is inconsistent with those policies; and (3) issued its final decision without considering the petitioners' exceptions to the order and without explaining its decision rejecting such exceptions. We affirm.

In December 1986, Metro applied to the City of Seattle for a plan shoreline permit[1] to allow it to construct a secondary sewage treatment plant at West Point, a site in Seattle's shoreline district.[2] West Point has been the site of Metro's primary sewage treatment facility since 1966. Metro's application for a permit addressed, among other things, the feasibility of constructing the plant at alternative sites: Interbay, Duwamish, and a "split" configuration with facilities at both Interbay and Duwamish.

Metro's permit application was reviewed by Seattle's Department of Construction and Land Use, pursuant to Seattle's Shoreline Master Program. The department recommended that the City deny the permit. The application was then reviewed by a hearing examiner for the City, who also recommended that it be denied. Ultimately, the application was reviewed by the Seattle City Council. After a hearing, the Seattle City Council, by a 6-to-3 vote, decided to issue the permit. As a part of its decision, it concluded that a feasible, nonshoreline alternative to the proposed facility at West Point did not exist. In order to minimize any environmental impact, however, the Council imposed numerous conditions on the issuance of the permit.[3]

The petitioners appealed the City Council's decision to the Shorelines Hearings Board. After a hearing, three

[1] A plan shoreline permit is required under Seattle's Shoreline Master Program before a sewage treatment facility can be constructed on a shoreline. Former Seattle Municipal Code 24.60.427.

[2] The Federal Water Pollution Control Act, 33 U.S.C. §§ 1251–1387, requires municipalities to provide secondary wastewater treatment by 1988.

[3] The City conditioned approval of the permit on Metro's agreement to: limit the area occupied at West Point, increase public access to the shorelines, dedicate portions of the site to park and recreation uses, create open space, evaluate beach improvements, implement odor and noise control measures, implement extensive visual mitigation measures, mitigate effects on wildlife habitat and establish a $30 million shoreline and park improvement fund.

members of the Board voted to affirm Seattle's issuance of the permit and three members voted against affirmance. The members voting for affirmance issued a "final decision," which included findings of fact and conclusions of law. The petitioners moved to recall that decision. The Board then converted its decision to a "proposed decision" and allowed the petitioners to file exceptions to it. After considering their exceptions, the Board, its membership still split 3 to 3, issued an order denying the petitioners' exceptions and adopted, as its final decision, the proposed decision.[4]

Petitioners sought review of the Board's decision in Thurston County Superior Court. We accepted that court's certification of the case to us for direct review.

STANDARD OF REVIEW

Review here is governed by the administrative procedure act, former RCW 34.04.[5] That statute provides, in pertinent part, as follows:

> The court may affirm the decision of the agency or remand the case for further proceedings; or it may reverse the decision if the substantial rights of the petitioners may have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
> (a) in violation of constitutional provisions; or
> (b) in excess of the statutory authority or jurisdiction of the agency; or
> (c) made upon unlawful procedure; or
> (d) affected by other error of law; or

---

[4]WAC 461–08–235 provides that, where a majority of the Board cannot agree after considering exceptions, the decision of the local government shall prevail. *See also Department of Ecology v. Kirkland*, 84 Wn.2d 25, 30, 523 P.2d 1181 (1974) (a tie vote of the Shorelines Hearings Board results in an affirmance of the decision being reviewed).

[5]RCW 34.04 was amended in 1988 and recodified as RCW 34.05. The amended APA applies to all agency proceedings begun on or after July 1, 1989. RCW 34.05.902. Although the Board's decision in this case was not issued until August of 1989, the proceedings were conducted in May and June of that year and therefore the earlier version of the APA applies.

(e) clearly erroneous in view of the entire record as submitted and the public policy contained in the act of the legislature authorizing the decision or order; or

(f) arbitrary or capricious.

Former RCW 34.04.130(6).

A factual finding is clearly erroneous if the appellate court is left with a definite and firm conviction that a mistake has been made. *Franklin Cy. Sheriff's Office v. Sellers*, 97 Wn.2d 317, 325, 646 P.2d 113 (1982), *cert. denied*, 459 U.S. 1106 (1983). It is not, however, the function of a reviewing court to "reweigh the evidence in an effort to reach different conclusions than did the agency. . . ." *Providence Hosp. v. Department of Social & Health Servs.*, 112 Wn.2d 353, 360, 770 P.2d 1040 (1989).

Pure questions of law are reviewed de novo. *Everett Concrete Prods., Inc. v. Department of Labor & Indus.*, 109 Wn.2d 819, 823, 748 P.2d 1112 (1988). Substantial deference is, however, afforded an agency's legal interpretations, particularly in those areas involving the agency's special knowledge and expertise. *Providence Hosp. v. Department of Social & Health Servs., supra*. Mixed questions of law and fact, on the other hand, require the court to interpret the law de novo and then apply the law to the facts as found by the agency and upheld on review by the appellate court. *Henson v. Employment Sec. Dep't*, 113 Wn.2d 374, 377, 779 P.2d 715 (1989); *Sellers*, 97 Wn.2d at 330.

No Feasible Alternative

Seattle's Shoreline Master Program provides that expansion or installation of sewage treatment plants is

prohibited in the Shoreline District *unless no feasible alternative[s] to that location exists*. The determination as to feasibility shall be based upon [1] the goals and policies of Resolution 25173 [the Seattle City Council's statement of goals and policies in adopting the Shoreline Master Program], [2] the Shoreline Management Act of 1971, as amended, and [3] a full consideration of the environmental, social and economic impacts on the community.

(Italics ours.) Former Seattle Municipal Code 24.60.610.

■■■ Both parties agree that whether or not a feasible alternative to the West Point site exists is a mixed question of law and fact. Although the petitioners have assigned error to most of the Board's findings, including those that support the conclusion that there were no feasible alternatives to the West Point site, they fail to argue that any of the Board's findings are clearly erroneous or deficient in any other respect. Assignments unsupported by argument *need not be considered on appeal.* RAP 10.3(a)(5); *Kagele v. Aetna Life & Cas. Co.,* 40 Wn. App. 194, 698 P.2d 90, *review denied,* 103 Wn.2d 1042 (1985). Consequently, in determining whether or not the Board erred in concluding that there were no feasible alternatives to West Point, we will apply the law to the facts as found by the Board. *See also Department of Ecology v. Kirkland,* 84 Wn.2d 25, 31, 523 P.2d 1181 (1974) (the reviewing court should review the Board's decision "within the context of the findings of fact and conclusions of the three board members who voted to affirm the City's position.").

The petitioners argue that the Board applied the wrong test in determining that "no feasible alternative" to the West Point proposal existed. Specifically, it contends that the Board wrongly applied a so–called "flexible balance" test in making its determination that there was no feasible alternative to the West Point site.

The meaning of the phrase "no feasible alternative" has not been considered by any court in this state. However, several federal cases have considered similar language in similar contexts. We find the pronouncements in those cases to be instructive. Petitioners highlight *Citizens To Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 28 L. Ed. 2d 136, 91 S. Ct. 814 (1971), in which the United States Supreme Court looked at similar language. The pertinent language appeared in section 4(f) of the Department of Transportation Act of 1966 and it related to construction projects on public lands. It provided, in part, that:

the Secretary [of Transportation] shall not approve any program or project which requires the use of any publicly owned

land from a public park . . . unless (1) there is *no feasible and prudent alternative* to the use of such land . . ..

(Italics ours.) 49 U.S.C. § 1653(f) (Supp. 5 1965–1969) (repealed 1983). The federal government argued in *Overton Park* that under the language of the act, the Secretary could, in making his decision, balance cost, safety and other factors associated with alternative construction plans against the obvious detriment that would result from construction of a highway in a park. The Court rejected that argument and remanded the matter to the District Court for a review of the entire administrative record and in doing so, it stated:

> Congress clearly did not intend that cost and disruption of the community were to be ignored by the Secretary. But the very existence of the statutes indicates that protection of parkland was to be given paramount importance. The few green havens that are public parks were not to be lost unless there were truly *unusual factors* present in a particular case or the cost or community disruption resulting from alternative routes reached *extraordinary magnitudes*. If the statutes are to have any meaning, the Secretary cannot approve the destruction of parkland unless he finds that alternative routes present *unique problems.*

(Italics ours.) *Overton Park,* at 412–13.

Petitioners, relying on *Overton Park,* argue that any technically feasible alternative, except perhaps one that presents unusual or extraordinary features, must be considered a feasible alternative to the West Point site.

The Ninth Circuit Court of Appeals distinguished *Overton Park* in *National Wildlife Fed'n v. Adams,* 629 F.2d 587 (9th Cir. 1980), a case that is similar to this one. In *Adams,* the court affirmed the District Court's denial of a motion for a preliminary injunction to restrain construction of a highway in the area of the Trident Submarine Base at Bangor in this state. The opponents of the highway argued that the location of the highway ran afoul of an executive order, which provided that "each agency, to the extent permitted by law, shall avoid undertaking or providing assistance for new construction located in wetlands unless the head of the agency finds (1) that there is *no practicable*

*alternative* to such construction . . .". (Italics ours.) Exec. Order No. 11,990, 42 Fed. Reg. 26,961 (1977). The order contained additional language that "[i]n making this finding [of no practicable alternative] the head of the agency may take into account economic, environmental and other pertinent factors." The court held in *Adams* that "the wording of the Executive Order is less prohibitive" than the statute that figured in *Overton Park* and that it "contemplates more balancing of other factors than did the statutes at issue in *Overton Park*". *Adams*, 629 F.2d at 591. The court said that "[t]he test for determining whether an alternative . . . under Executive Order 11,990 is practicable is whether it is capable of attainment within relevant, existing constraints." *National Wildlife Fed'n v. Adams*, at 591–92. *See also Community Action of Laramie Cy., Inc. v. Bowen*, 866 F.2d 347, 354 n.2 (10th Cir. 1989) ("Thus, *Overton Park* involved a statute which set clear guidelines within which the Secretary was bound to exercise his discretion.").

█ We are persuaded that Seattle's Shoreline Master Program requires the type of balancing that appears to have been employed by the City of Seattle and affirmed by the Shorelines Hearings Board. The language of the Shoreline Master Program that requires "full consideration of the environmental, social and economic impacts of the proposal" dictates such a balancing. In our judgment, it is more akin to the language in the executive order considered by the court in *Adams,* which allowed consideration of "economic, environmental and other pertinent factors" in the determination of whether or not there was "no practicable alternative" to the proposal.[6] We conclude, therefore, that where, as in this case, the language of a statute or

---

[6]The language of the Seattle Shoreline Master Program, which states that the determination of feasibility "*shall* be based upon . . . full consideration of the environmental, social and economic impacts on the community" (italics ours) is more strict in requiring consideration of other factors than the executive order in *Adams*. That order provided that the head of the agency "*may* take into account" (italics ours) other factors.

ordinance provides an agency with specific factors it must consider in determining feasibility, the agency has a duty to consider those factors in making its determination as to the feasibility of alternatives to the proposal. Conversely, where no such language appears, as in *Overton Park,* a governmental entity such as the City of Seattle has less flexibility and any technically feasible alternative, regardless of its cost and other impacts, must generally be considered a "feasible alternative" to the proposed plan.

In affirming the City's determination that there were no feasible alternatives to the West Point plant, the Board examined the environmental, economic and social impacts the various proposals would have on the community and it compared them to the impacts presented by the West Point proposal. It found that construction of the plant at the alternative sites would cost Metro's ratepayers between $238 and $370 million (in 1988 dollars) more than would the West Point plan and that this fact would have a significant impact on those ratepayers.[7]

The Board found, also, that the amount of land currently available at the Interbay site was not large enough to accommodate the entire treatment plant as proposed for Interbay or the portion of the plant proposed to be built there under the split alternative proposal. In order to obtain sufficient land, Metro would have to acquire and rezone other land, displace a community center and a National Guard facility as well as 59 businesses. In addition, it found that prevailing winds in the Interbay area would reduce the likelihood that potential odors would be disbursed in a satisfactory manner. Construction at that site, it determined, would have a greater impact on the

---

[7]The Board made findings regarding the economic impact on householders of the respective alternatives. It found that a household is placed into economic "hardship" when its sewer bill equals 1.75 percent or more of the household's total income. It found, also, that if the cost of construction at the alternative sites was passed on to ratepayers, between 73,047 and 78,203 households would be placed into economic hardship, whereas only 66,601 households would be placed into economic hardship as a result of construction at West Point.

nearby community than would construction at the West Point site.[8]

The Board found that the Duwamish site also presented considerable construction difficulties. It would be necessary to dig and lay 16 miles of large diameter pipe under the streets of Seattle and across the Duwamish River, a process that would disturb contaminated sediment at the bottom of that river.[9] They found, in addition, that because the Duwamish site is south of Elliott Bay, there is a "greater probability of southward pollutant transport," whereas the currents at the West Point site "favor northward transport of effluent out of Puget Sound." Like the Interbay and split alternatives, construction at the Duwamish site would, in the Board's judgment, have a greater impact on the surrounding area than would construction at West Point.[10] It also found that several businesses and their employees would be displaced by the location of the facility at that site.

The Board recognized that locating the plant at West Point would not be without negative environmental impact. For example, the West Point plan required expansion of existing facilities, making it necessary to double the acreage of the present facility. This enlargement of the West Point facility, it found, would prevent future expansion of Discovery Park. The Board found, however, that no businesses would be displaced, that construction at West Point would have a lesser impact on the area than would construction at

---

[8]The Board found that during construction the number of truck trips per day to the Interbay site would exceed the trips required for construction at West Point.

[9]Because sewage from the Interbay plant would be discharged at West Point, under the split alternative, the 16-mile-long pipe need not be laid.

[10]Construction at the Duwamish site would require more truck trips per day than would the West Point plan.

the alternative sites, and that the cost of the West Point proposal would be less than the other projects.[11]

Reviewing these findings under the *Adams* standard, we conclude that they adequately support the Board's determination that there were no feasible alternatives to the West Point plan. While reasonable persons could perhaps differ over the suitability of each site, it appears that the Seattle City Council and the Board considered the various factors that they were required to consider in making their determination. We are not inclined to disturb their judgment.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

PETRICH and WORSWICK, JJ., concur.

Reconsideration denied February 15, 1991.

---

[11]The Board found that the complete cost of each of the proposals was as follows:

| | |
|---|---|
| West Point | $1.807 billion |
| Interbay | 2.045 billion |
| Duwamish | 2.036 billion |
| Split Alternative | 2.177 billion |