The SIERRA CLUB et al.,
Plaintiffs-Appellants,

v.

Stanley K. HATHAWAY et al.,
Defendants-Appellees.

No. 75–3216.

United States Court of Appeals,
Ninth Circuit.

Aug. 11, 1978.

**1164**

Peter C. Davis (argued), of Merten & Saltveit, Portland, Or., for plaintiffs-appellants.

Edward J. Shawaker, Atty. (argued), Dept. of Justice, Washington, D.C., for defendants-appellees.

Before KENNEDY and TANG, Circuit Judges, and JAMESON,* District Judge.

TANG, Circuit Judge:

The Sierra Club and the Oregon High Desert Study Group, both non-profit, environmental organizations, appeal from an order of the district court denying their request for a preliminary injunction. In the court below, appellants sought to prevent the Secretary of the Interior from executing lease agreements that would give private parties the right to explore for and commercially produce geothermal steam and associated geothermal resources in the Alvord Desert Known Geothermal Resource Area (KGRA). Alternatively, in the event the leases had already been executed, the Sierra Club asked the district court to restrain any lessee from undertaking any right or privilege granted by his leases.

The appellants based their complaint on the Secretary of the Interior's failure to draft an Environmental Impact Statement (EIS), as required by the National Environmental Policy Act, 42 U.S.C. § 4321 et seq., prior to the execution of the leases. The Sierra Club has standing under *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). The district court found that the initial step of the exploration phase, "casual use," would not significantly affect the environment and thus concluded that appellants had failed to establish a strong likelihood of success on the merits. The district court denied the injunction but demanded monthly reports detailing the ongoing exploration activities to insure that the environment would not be significantly affected without full compliance with NEPA.

Our review of the record and the federal regulations governing the geothermal development program convinces us that the district court did not abuse its discretion and its order denying the injunction should be affirmed.

THE GEOTHERMAL LEASING PROGRAM

The Geothermal Steam Act of 1970, 30 U.S.C. §§ 1001–1025, empowers the Secretary of the Interior to issue leases for the development and utilization of geothermal steam and associated geothermal resources on lands where the United States had reserved rights to the geothermal steam located therein. 30 U.S.C. § 1002. A Known Geothermal Resource Area is defined as:

> [A]n area in which the geology, nearby discoveries, competitive interests, and other indicia would, in the opinion of the Secretary, engender a belief in men who

---

* The Honorable William J. Jameson, Senior United States District Judge, District of Montana, sitting by designation.

are experienced in the subject matter that the prospects for extraction of geothermal steam or associated geothermal resources are good enough to warrant expenditures of money for that purpose.
. . .

30 U.S.C. § 1001(e). Land leased within a KGRA can only be leased to the "highest responsible qualified bidder." 30 U.S.C. § 1003.

Regulations were issued pursuant to the Act, and the responsibility for administering the geothermal leasing program was divided between the Bureau of Land Management (43 C.F.R. Group 3200) and the United States Geological Survey (30 C.F.R. Group 270).[1] In 1974 the Geothermal Steam Act of 1970 was supplemented by the Geothermal Energy Research, Development and Demonstration Act, which directed the federal government to "encourage and assist private industry through Federal assistance for the development and demonstration of practicable means to produce useful energy from geothermal resources with environmentally acceptable processes." 30 U.S.C. § 1101(12). The Act established the Geothermal Energy Coordination and Management Project, which was directed to prepare and oversee a comprehensive national program for the effective development of geothermal energy resources. 30 U.S.C. § 1121.

In October 1973, the Department of the Interior published a programmatic EIS[2] covering the geothermal leasing program. This EIS was exhaustive in its analysis of the environmental implications of geothermal development. According to this EIS, the development and production of geothermal resources involved six phases:

exploration, test drilling, production testing, field development, power plant and power line construction, and full-scale operations. For purposes of this appeal, we need only concern ourselves with the exploration phase.

This initial phase encompasses locating and defining commercial geothermal reservoirs and evaluating the impact of possible site-specific geothermal development upon the environment.[3] Exploration operations include, but are not limited to, geophysical operations, drilling of shallow temperature gradient wells, construction of roads and trails, and cross-country transit by vehicle over public lands. 43 C.F.R. § 3209.0–5(a).

Casual use is the first step in the exploration phase and involves practices which do not ordinarily lead to any appreciable disturbance or damage to lands, resources, and improvements.[4] 43 C.F.R. § 3209.0–5(d). A lessee is initially prohibited from entering leased lands for any purpose other than casual use, and may undertake further exploration operations only after submitting a detailed plan of operations and obtaining approval from the Geologic Survey. 43 C.F.R. § 3203.6. Among other things, the plan of operations must contain a narrative statement describing the proposed measures to be taken for protection of the environment, including, but not limited to, the prevention or control of (1) fires, (2) soil erosion, (3) pollution of the surface and ground water, (4) damage to fish and wildlife or other natural resources, (5) air and noise pollution, and (6) hazards to public health and safety during lease activities. 30 C.F.R. § 270.34(h).

This regulatory scheme and its limitation of allowing the lessee to undertake only

1. *See* Secretary of the Interior's Order No. 2948, October 6, 1972.

2. A programmatic EIS is one which addresses a specific *long-term development program of* national scope that will proceed in distinct stages. A programmatic EIS deals with the broad environmental ramifications of a program, whereas a regional or site-specific EIS catalogues the environmental implications for a local area.

3. I. *Department of the Interior*, Final Environmental Statement for the Geothermal Leasing Program at III–2.

4. Casual use activities include the use of existing roads and trails to conduct a variety of surveys such as: (1) geochemical surveys of water and vegetation, (2) stratigraphic, lithographic and structural mapping, and (3) micro gas surveys of air. I, Final Environmental Statement for the Geothermal Leasing Program at III–3.

casual use surveys on the land was critical to the district court's determination that the leasing program for the Alvord Desert would not significantly affect the quality of the environment, at least in the immediate future.

## ALVORD DESERT GEOTHERMAL LEASING PROGRAM

The Alvord Desert Known Geothermal Resource Area is in Harvey County, southeastern Oregon. The Alvord KGRA is a sparsely populated undeveloped desert region (population less than 50 people) with an economy based primarily upon lumber, livestock and recreation. The Alvord site is adjacent to the Steens Mountains, a major scenic recreation area in Oregon. Hot spring sites in the Alvord area are used for recreation campsites, geological study, historical research and mineral water bathing. The Alvord Desert is currently under evaluation for its worth as a roadless, primitive, and/or wilderness area. The Steens Mountains are being considered as the site for a portion of the proposed Desert National Trail similar to the Appalachian and Pacific Crest Trails. Finally, the area is also valuable for hunting, fishing, rock hounding and general recreation use oriented to vehicle access.[5]

In January 1975, the Burns District of the Bureau of Land Management prepared an Environmental Analysis Record (EAR) on the Alvord Desert Geothermal Leasing Program, as prescribed by the BLM Manual, part 1791. The EAR catalogued the ecology of the Alvord KGRA and was submitted to the BLM. This analysis served as the basis from which BLM officials could determine whether an EIS was required. BLM Manual, part 1791.25. Their conclusion that an EIS should not be prepared was also based on: (1) the low level of public controversy, (2) the fact that a programmatic EIS had been prepared on the Geothermal Leasing Program, (3) the provision that pre-lease and post-lease exploration, and subsequent plans of operation for surface installations or subsequent well work will be subject to EAR preparation by the BLM, or EAR preparation by the USGS and/or EIS preparation, and (4) the provision that surface protection and rehabilitation requirements may be tailored to specific activities and sites as the activities and sites were identified.[6] The appellants contend this decision is a fundamental violation of NEPA and assert that the district court erred in denying their request for injunctive relief by relying upon the false assumption that NEPA required the agency to look only at the initial impact of the project rather than the overall impact of the entire program. Our review at this juncture is limited to the propriety of the denial of injunctive relief and we intimate no review regarding the merits of the underlying controversy.

## DISCUSSION

■ At the outset, we note that appellant's alternative remedy, that the district court enjoin the Secretary of the Interior from permitting the lessees to exercise any rights they may have acquired from the leases, raises problems regarding failure to join the lessees as indispensable parties. The lessee's interests in the Alvord KGRA are not distinct and severable, and certainly a court order prohibiting the Secretary from allowing the lessees to undertake any exploration operations pursuant to their leases would have an injurious effect upon their interest. Therefore, the lessees must be considered persons who should have been joined under Rule 19(a), Fed.R.Civ.P. *State of Washington v. United States*, 87 F.2d 421, 427–428 (9th Cir. 1936).

■■ However, when the judgment appealed from does not in a practical sense prejudicially affect the interests of the absent parties, and those who are parties have failed to object to non-joinder in the trial court, the reviewing court will not dismiss an otherwise valid judgment. *Provident Bank v. Patterson*, 390 U.S. 102, 110–111, 88

---

**5.** *See generally* the BLM Management Framework Plan for the Andrews Resource Area.

**6.** BLM EAR for the Alvord Desert Geothermal Leasing Program, at 64.

S.Ct. 733, 19 L.Ed.2d 936 (1968); *Continental Insurance Co. of New York v. Cotten,* 427 F.2d 48, 51 (9th Cir. 1970). Accordingly, we conclude that the district court properly exercised its jurisdiction.

 In reviewing the denial of interlocutory relief, we need only determine whether the district court abused its discretion or based its decision upon an erroneous legal premise. *Shinto Shipping Co. v. Fibrex & Shipping Co., Inc.,* 572 F.2d 1328, 1331 (9th Cir. 1978); *Warm Springs Dam Task Force v. Gribble,* 565 F.2d 549, 551–552 (9th Cir. 1977); *Aguirre v. Chula Vista Sanitary Service,* 542 F.2d 779, 780–781 (9th Cir. 1976). The considerations in determining whether to grant or deny injunctive relief are threefold: (1) have the movants established a strong likelihood of success on the merits; (2) does the balance of irreparable harm favor the movants; (3) does the public interest favor granting the injunction?[7] *Warm Springs Dam Task Force v. Gribble, supra,* 565 F.2d at 551.

## LIKELIHOOD OF SUCCESS OF THE MERITS

In order to succeed on the merits the appellants must establish one of two factors: (1) that the immediate "casual use" surveys will significantly affect the environment, or (2) that the BLM and the USGS will permit the leasing program to proceed into its advanced phases without fully considering their obligation to comply with the EIS requirements of NEPA. The likelihood that appellants can succeed in proving either of these two elements of their case on the merits appears minimal.

 With regard to the first factor, the programmatic EIS[8] and the federal regulations that implement the Geothermal Leasing Program, particularly 43 C.F.R. §§ 3203.6 and 3209.0–5(d), clearly indicate that the casual use step of the exploration phase does not involve activities that would substantially affect the environment. In addition, the district court was aided by extensive testimony from nine experts in relevant fields, including a geologist, zoologist, and anthropologist, in reaching the same conclusion. Due regard must be given the district court's opportunity to receive and evaluate this testimony in our determination of whether the court's finding was clearly erroneous. *Interform Co. v. Mitchell,* 575 F.2d 1270, 1274 (9th Cir. 1978); Fed.R.Civ.P. 52(a). We conclude that the district court's finding that casual use would not significantly affect the environment was not clearly erroneous.

Several factors also strongly suggest that the two government agencies responsible for administering the geothermal leasing program will either prepare an EIS at the appropriate phase of development or issue a statement of reasons[9] detailing their rationale for concluding otherwise. As previously discussed, the BLM is required to prepare an Environmental Analysis Record (EAR) for all Bureau action and the EAR is to serve as an analysis from which the agency can determine and recommend whether an EIS is needed. BLM Manual, parts 1791.06 and 1791.25. The plan of operation which the lessee must file and have approved by the Geological Survey before proceeding to a phase beyond casual

---

7. Assuming without deciding that the alternative test for injunctive relief adopted by this Circuit in *Wm. Inglis & Sons Baking Co. v. ITT Cont. Baking Co.,* 526 F.2d 86 (9th Cir. 1975), applies to environmental cases, we are of the opinion that our discussion regarding the standard test also demonstrates that appellants have failed to show "either a combination of probable success and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tips sharply in [their] favor." 526 F.2d at 88.

8. *See* Note 3, *supra,* and accompanying text.

9. One circuit has suggested that the function of judicial review in the area of environmental protection is to require the agency to provide a framework for principled decision making. Thus agencies that are engaging in long-term development programs should be required to evaluate periodically whether the time for an EIS has arrived and issue a statement of reasons for a negative conclusion. *Scientists' Institute for Pub. Info., Inc. v. Atomic Energy Com'n,* 156 U.S.App.D.C. 395, 481 F.2d 1079 (1973).

use requires the inclusion of proposed measures that will be taken to protect the environment. 30 C.F.R. § 270.34(h). The lease specifically requires that the lessee protect the environment, BLM Geothermal Resources Lease, section 14, and failure to comply fully with the lease provisions and the pertinent regulations could result in termination. 30 U.S.C. § 1011. In addition, the district court is receiving monthly reports on all exploration activities that are being undertaken in the Alvord KGRA to insure that the agencies are conscientiously administering the program in accordance with their regulations. Manifestly, therefore, the lease provisions coupled with the regulations establish continuing federal control with required specific consideration of the environmental aspects of the leasing program. See Manygoats v. Kleppe, 558 F.2d 556, 559 (10th Cir. 1977).

 Although the filing of an EIS should generally precede federal agency action, Cady v. Morton, 527 F.2d 786, 794 (9th Cir. 1975), an agency can only be required to analyze specific actions of known dimensions. Kleppe v. Sierra Club, 427 U.S. 390, 402, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976). Thus, when agencies are merely contemplating a project and it is unclear whether the program will necessarily result in a proposal for major federal action, preparation of an EIS is not required. Kleppe v. Sierra Club, supra, at 406 407, 96 S.Ct. 2718. The Geothermal Leasing Program, at least insofar as site-specific development is concerned, has yet to reach dimensions of specific proportions such that it amounts to a proposal for major federal action. Compare Mobil Oil Corp. v. F.T.C., 562 F.2d 170, 172–173 (2d Cir. 1977) (the commencement

of a § 5 adjudicatory proceeding was not a specific proposal for federal action as discussed in Kleppe), with Realty Income Trust v. Eckert, 183 U.S.App.D.C. 426, 434, 564 F.2d 447, 455 (1977) (construction of a $25 million federal office building was proposed specific action of known dimensions). Neither the BLM nor the USGS have made the "critical agency decision" that immediately precedes the point where there will be "irreversible and irretrievable commitments of resources" to action affecting the environment. Mobil Oil Corp. v. F.T.C., supra, 562 F.2d at 173; Friends of the Earth v. Coleman, 513 F.2d 295, 299 (9th Cir. 1975).

 By requiring impact statements Congress intended to assure that all federal agencies consider the environmental impact of their actions during the formulation of a position on a proposal submitted by private parties. Kleppe v. Sierra Club, supra, 427 U.S. at 409, 96 S.Ct. 2718; Trout Unlimited v. Morton, 509 F.2d 1276, 1283 (9th Cir. 1974). It cannot be said at this stage of development that the government is not making a good faith attempt to weigh environmental factors before condoning a course of action. See National Forest Preservation Group v. Butz, 485 F.2d 408, 412 (9th Cir. 1973); Jicarilla Apache Tribe of Indians v. Morton, 471 F.2d 1275, 1283 (9th Cir. 1973).[10] Moreover, in balancing the equities relative to the denial of an injunction, this Circuit has considered it significant that a state environmental impact report had already been prepared on the project. Friends of the Earth, Inc. v. Brinegar, 518 F.2d 322, 330 (9th Cir. 1975). Here the government has prepared a programmatic EIS and a site-specific EAR which are similarly significant to our bal-

---

**10.** One Circuit has expressly held that when a movant is requesting injunctive relief for failure of an agency to fully comply with NEPA, he bears the additional burden of showing agency bad faith in refusing to comply. Rhode Island Comm. on Energy v. General Services, 561 F.2d 397, 405 (1st Cir. 1977). We do not adopt this holding, but note that appellant has presented no evidence showing agency bad faith. Compare Jette v. Bergland, 579 F.2d 59, No. 76 2129 (10th Cir. May 11, 1978), 11 ERC

1658 (the court noted that agency procedure had allowed the Forest Service to avoid the preparation of an EIS: "The bureau or agency does not discharge its duty by going through meaningless motions and never facing the question directly, nor does it aid the execution of the provisions of this Act to raise technical questions concerning the exhaustion of department remedies." 579 F.2d at 63, 11 ERC at 1662).

ancing of the equities.[11] We conclude, therefore, that appellants have not demonstrated a strong likelihood that they might succeed on the merits and hold that the district court's denial of the requested injunctive relief did not amount to an abuse of discretion.

---

11. The Council on Environmental Quality has advised federal agencies through its published guidelines that a programmatic EIS is the preferred method for dealing with federal programs that may involve a multiplicity of individual actions. The guideline states that an overall EIS provides an occasion for a "more exhaustive consideration of effects and alternatives than would be practicable in a statement on an individual action." The programmatic EIS on the exploitation of geothermal steam under the Geothermal Steam Act of 1970 is cited as an example of the type of statement the CEQ considers appropriate to satisfy their guideline. 102 Monitor Vol. 2, No. 5, p. 18, June 1972. It is quite possible, therefore, that the programmatic EIS is all that need be prepared to cover the geothermal leasing program. *Compare Natural Resources Defense Council, Inc. v. Morton*, 388 F.Supp. 829, 839–41 (D.D.C.

1974), *aff'd without opinion*, 174 U.S.App.D.C. 77, 527 F.2d 1386 (1976), *cert. denied*, 427 U.S. 913, 96 S.Ct. 3201, 49 L.Ed.2d 1204 (1976) (held that a BLM programmatic EIS addressing a livestock grazing permit program, standing alone, was insufficient because it did not provide an individualized assessment of the impact on the local environments), *with Natural Resources Defense Council, Inc. v. Tennessee Val. Auth.*, 367 F.Supp. 122, 132 (E.D.Tenn.1973), *aff'd*, 502 F.2d 852 (6th Cir. 1974) (held that a programmatic EIS covering a T.V.A. coal supplier contracting program was adequate and the agency was not required to prepare an EIS on each contract; in addition, the court felt the terms of the contract and the government regulations requiring a pre-mining plan of operation augmented the programmatic EIS sufficiently to satisfy NEPA).