**BOB MARSHALL ALLIANCE, et al., Plaintiffs,**

**v.**

**James G. WATT, et al., Defendants.**

**No. CV–82–015–GF.**

United States District Court,
D. Montana,
Great Falls Division.

May 27, 1986.

Stephan C. Volker, Sierra Club Legal Defense Fund, Inc., San Francisco, Cal., James A. Patten, Patten & Renz, Billings, Mont., Karin P. Sheldon, Sierra Club Legal Defense Fund, Inc., Denver, Colo., Robert Schaeffer & Perry Wallace, U.S. Dept. of Justice, Land & Nat. Resources Div., Washington, D.C., for plaintiffs.

Carl E. Rostad, Asst. U.S. Atty., Billings, Ronald Lodders, Crowley, Haughey, Hanson, Toole & Dietrich, Billings, Mont., for defendants.

Robert B. Cousins, Jr., Shank, Irwin & Conant, Dallas, Tex., for intervenor–Placid Oil Co.

Michele A. Giusiana, Land & Nat. Resources Div., General Litigation Section, Washington, D.C.

David A. Veeder, Davidson, Veeder, Baugh, Broeder, Billings, Mont., for intervenor.

## MEMORANDUM AND ORDER

HATFIELD, District Judge.

The plaintiffs, Bob Marshall Alliance and the Wilderness Society, bring this action pursuant to the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4331–4332, and the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 *et seq.*, challenging the defendant United States Department of Interior's decision not to prepare an Environmental Impact Statement ("EIS") prior to leasing certain land within the National Forest System, *i.e.*, the Deep Creek/Reservoir North Further Planning Area ("Deep Creek Area"), for the purpose of allowing exploration for oil and natural gas. Jurisdiction over the subject matter of this controversy vests in this court pursuant to 28 U.S.C. § 1331.

The matter is presently before the court on cross-motions of the parties requesting the court to enter summary judgment in their respective favors. Because the court concludes that the decision of the defendants not to prepare an EIS was unreasonable, the court finds it appropriate to enter judgment in favor of the plaintiffs.

## I. FACTUAL BACKGROUND

The Deep Creek Area, comprising about 42,000 acres of the Lewis and Clark National Forest, is a rugged, remote and scenically varied terrain which forms a portion of the Rocky Mountain Front. A dramatic series of deep escarpments and parallel valleys separates the Rocky Mountains from the northern high plains. Ridges within the area reach elevations of about 8,500 feet, while valley bottoms lie generally about 4,500 feet above sea level. The Area is bounded on the west by three contiguous, congressionally designated, wilderness areas, specifically the Bob Marshall, the Scapegoat and the Great Bear Wilderness Areas, which cover a combined area of approximately 1,482,000 acres. On its east side, the Deep Creek Area abuts three Bureau of Land Management wilderness study areas.

The geology of the Area offers spectacular scenery. The eastern faces of the parallel north-south trending ridges are vertical fault scarps of grey-white Madison limestone, the tops of which tower as much as 4,000 feet above the surrounding valleys. Castle Reef and Chute Mountain on Deep Creek's eastern edge, facing the Northern Plains, are visible from the prairie for dozens of miles. The area is bordered on the western side by ridges which slope deeply down to the narrow stream bottoms.

Among the numerous species of wildlife endemic to the Deep Creek Area are Rocky Mountain Bighorn sheep, elk, mule and white-tailed deer, black bear, moose, mountain goat and mountain lion. While not admitted by the Government, the plaintiffs submit that it is generally believed that the Deep Creek Area provides critical habitat for the grizzly bear, the gray wolf, the peregrine falcon and the bald eagle, all of which are threatened or endangered species. Along with the wilderness complex it borders, the Deep Creek Area may well support a large portion of the entire grizzly population of the contiguous 48 states.

The Deep Creek Area is laced with several streams with significant sport fishery value. Those streams, which include the North and South Forks of Deep Creek, possess a pristine water quality.

Recreational use of the Deep Creek Area by local residents and permittees at nearby Forest Service cabins, commercial outfitters, visitors staying at camp grounds or camping in the back country, and visitors staying at guest ranches in the area is substantial.

The unique geological and ecological attributes of the Deep Creek Area account for the area's receiving a perfect wilderness attribute rating in the Forest Service's Roadless Area Review and Evaluation ("RARE II").[1] Nonetheless, because of the

---

1. Rare II was a programmatic evaluation of the 62 million acres of roadless areas in the National Forest System. Each roadless area was allocated to one of three planning categories: Wilderness, Further Planning, and Non–Wilderness. Areas allocated to the Wilderness category were recommended for inclusion in the National Wilderness Preservation System. Areas allocated to the Further Planning category are to be protected pending completion of unit management plans which would consider whether to recommend the area for Wilderness classification.

area's undetermined oil and natural gas potential, the Forest Service's Rare II decision assigned the area to the Further Planning category, rather than the Wilderness category. Having been designated a Further Planning Area, Deep Creek was made available for all uses permitted under applicable land use plans, provided it was managed so as to preserve suitability for potential Wilderness designation at a later date.

Upon receiving numerous applications for oil and natural gas leases within the Deep Creek Area, the Bureau of Land Management ("BLM") requested the Forest Service to analyze the impacts of oil and gas exploration and development on the environment of the Deep Creek Area, and make recommendations concerning the propriety of allowing leases for exploratory purposes. In January of 1981, the Regional Forester of Region I of the National Forest System recommended that the BLM lease the entire acreage of the Deep Creek Area for oil and gas exploration and development. The Regional Forester's recommendation was made prior to the preparation, and without the benefit of, any EIS. The Regional Forester simply concluded that the issuance of the oil and gas leases would have no significant adverse effects on the human environment, thereby obviating the need for an EIS.

In February of 1981, the plaintiffs, pursuant to 36 C.F.R. § 211.19, appealed the Regional Forester's recommendation to the Chief of the Forest Service. The plaintiffs' appeal was denied, and the decision of no "significant impact" affirmed by the Chief of the Forest Service in May of 1981. Their administrative remedies before the Department of Agriculture exhausted, the plaintiffs filed a protest with the Montana state office of the BLM, requesting that entity not to follow the recommendation of the Forest Service. The plaintiffs' protest, however, was dismissed by the Director of the BLM. The Secretary of the Interior, through his Assistant Secretary, affirmed the decision of the BLM Director. In January, 1981, the BLM, under authority of the Mineral Leasing Act of 1920, 30 U.S.C. § 226, began issuing leases for the purpose of oil and gas exploration within the Area.

Sixteen leases have been issued for the Area.

The plaintiffs instituted the present action, pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 701–706, to obtain judicial review of the Secretary's decision to lease the Deep Creek Area. The plaintiffs contend the decision violates the mandates of NEPA, the mandates of the ESA, and the Forest Service's regulations regarding activity within further planning areas.

## II. ANALYSIS

### A. Standard of Review.

■ The Court of Appeals for this Circuit has consistently held that an agency's determination that a particular project does not require the preparation of an EIS is to be upheld unless unreasonable. *Foundation for North American Wild Sheep v. United States,* 681 F.2d 1172, 1177 (9th Cir.1982); *Portela v. Pierce,* 650 F.2d 210, 213 (9th Cir.1981); *City and County of San Francisco v. United States,* 615 F.2d 498, 500 (9th Cir.1980). As noted by the court in *Foundation for North American Wild Sheep,* the decision to prepare an EIS is not a matter committed to the particular agency's discretion. 681 F.2d at 1177, n. 24. Consequently, the "arbitrary and capricious" standard normally applicable to reviewing an agency's discretionary decisions, is inapplicable to agency actions falling within the purview of NEPA. *Id.* The mandatory nature of NEPA's directive that an EIS must be prepared for actions that may significantly affect the quality of the human environment renders the "reasonableness" standard the appropriate standard of review. *Id.*

### B. The NEPA Claims.

By its terms, NEPA mandates the preparation of an EIS for all "major federal actions significantly affecting the quality of the human environment ...," NEPA § 102(2)(C), 42 U.S.C. § 4332(2)(C). *See also, Kleppe v. Sierra Club,* 427 U.S. 390, 399, 96 S.Ct. 2718, 2725, 49 L.Ed.2d 576 (1976). The broad scope of NEPA represents a firm congressional mandate direct-

ing agencies to consider environmental factors on an equal basis with other, more traditional, concerns, prior to taking action. *Foundation for North American Wild Sheep v. United States,* 681 F.2d at 1177.

The plaintiffs assert two distinct NEPA claims. First, the plaintiffs contend that the decision to issue oil and gas leases in the Deep Creek Area constitutes a major federal action significantly affecting the quality of the human environment, which requires the preparation of an EIS. 42 U.S.C. § 4332(2)(C)(i). Second, the plaintiffs maintain that because NEPA requires agencies to consider reasonable alternatives to a contemplated federal action, a "no-leasing" alternative was reasonable and should have been considered. 42 U.S. C. § 4332(2)(E).

### (1) Major Federal Action.

In analyzing the merits of a NEPA claim, the courts must heed NEPA's broad scope in forcing agencies to be actively aware of environmental concerns. "The statutory phrase 'actions significantly affecting the quality of the environment' is intentionally broad, reflecting the Act's attempt to promote an across-the-board adjustment in federal agency decision making so as to make the quality of the environment a concern of every federal agency." *Scientists' Institute for Public Information, Inc. v. Atomic Energy Comm'n.,* 481 F.2d 1079, 1088 (D.C. Cir.1973). The prescriptions of NEPA require an agency to prepare an EIS for all proposals which may significantly affect the quality of the human environment. In that regard it has been stated:

> The standard for determining whether the implementation of a proposal would significantly affect the quality of the human environment is whether "the plaintiff has alleged facts which, if true, show that the proposed project *may* significantly degrade some human environmental factor". *Columbia Basin Land Protection Ass'n. v. Schlesinger,* 643 F.2d 585 at 597 (9th Cir.1981) (emphasis in original). *See also, City and County of San Francisco v. United States,* 615 F.2d at 500; *City of Davis v. Coleman,* 521 F.2d [661] at 673 [9th Cir.1975]; *Save*

*Our Ten Acres v. Kreger,* 472 F.2d 463, 467 (5th Cir.1973) (Emphasis Supplied). *Foundation For North American Wild Sheep v. U.S.,* 681 F.2d at 1177–78.

Consequently, this court must determine if "substantial questions" are raised with respect to whether the Deep Creek Area leases may have a significant effect upon the human environment. If such questions are raised, the defendants' failure to prepare an EIS violated NEPA. *Thomas v. Peterson,* 753 F.2d 754, 759 (9th Cir.1985); *Foundation For North American Wild Sheep,* 681 F.2d at 1178.

The Forest Service prepared an Environmental Assessment ("EA") for the proposal to lease the Deep Creek Area. The analysis conducted resulted in a Finding of No Significant Impact ("FONSI"). After listing the alternatives purportedly considered, the EA concluded by recommending that surface occupancy in the Deep Creek Area on slopes less than 40 percent in grade be allowed, provided the leases contained certain restrictive stipulations which would serve to mitigate, to a certain extent, the environmental degradation caused by oil and gas exploration activities. These mitigating measures, in turn, would be followed by site-specific assessments based upon individual proposals from lessees. The Forest Service determined that the environmental effects would be subject to the scope of activities proposed for a specific site and that further assessments, or, perhaps, an environmental impact statement, would be conducted at a point in time when the analyses would be more meaningful, because the extent of the lessees' proposed activities would be known. The defendants took and maintain the position that the act of leasing alone does not result in environmental degradation, a fact which obviates the need for an EIS at the leasing stage. Moreover, the defendants submit, individual, staged, assessments of the effects of oil and gas activities is an acceptable method of procedure under NEPA.

#### (a) Stipulations.

Citing *Cabinet Mountains Wilderness/Scotchman's Peak Grizzly Bears, et al. v. Peterson,* 685 F.2d 678 (D.C. Cir.

1982), the defendants assert that an agency may consider mitigation measures that reduce environmental impacts to a minimum when determining whether an EIS is required:

> If, however, the proposal is modified prior to implementation by adding specific mitigation measures which completely compensate for any possible adverse environmental impact stemming from the original proposal, the statutory threshold of significant environmental effects is not crossed and an EIS is not required.

685 F.2d at 682.

The plaintiffs do not dispute the proposition of effective mitigation, but contend that the measures established by the stipulations in the leases at issue would not serve to "completely compensate for any possible environmental impacts." The court agrees. In that regard, the EA prepared for the Deep Creek Area concludes that exploration activities alone, assuming no commercial development or production takes place, will substantially impair the wilderness character of Deep Creek for a period of 3 to 20 years and would reduce Deep Creek's wilderness rating from a perfect 28 to a mediocre 19.

One protective stipulation, covering 75% of the leased Deep Creek Area, which is of particular importance, is the No Surface Occupancy ("NSO") restriction. The NSO restriction prohibits any activity in the particular leased area. The NSO stipulation, however, should not be used to circumvent the requirement of preparing an EIS. *Conner v. Burford,* 605 F.Supp. 107, 108 (D.Mont.1985).

The federal defendants have not asserted that their environmental concerns for the Deep Creek Area are resolved by the protective stipulations and the completion of the Deep Creek Area EA. They anticipate further review and analysis based on specific proposals from lessees.

#### (b) Multi–Stage Analysis.

Asserting the propriety of environmental analysis in stages, defendants place special emphasis upon the rationale of *Sierra Club v. Hathaway,* 579 F.2d 1162 (9th Cir.1978). In *Hathaway,* the BLM prepared an Environmental Analysis Record on the Alvord Desert Geothermal Leasing Program and determined that preparation of an EIS was not necessary. The BLM issued leases which permitted only "casual use", a term defined by regulation which does not include activities off existing roads. 579 F.2d at 1165, n. 4. The Deep Creek Area is, of course, a roadless area, and oil and gas exploration will involve substantial off road activities resulting in appreciable environmental degradation.

The defendants also rely on the holding of the Second Circuit Court of Appeals in *County of Suffolk v. Secretary of the Interior,* 562 F.2d 1368 (2nd Cir.1977), *cert. den.,* 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed. 2d 764 (1978), wherein that court held that it would be a "meaningless exercise" to attempt to project possible consequences of future, and uncertain, oil pipeline projects. In *County of Suffolk,* the court stated that the rule of reason in determining whether environmental analysis has been sufficient to comply with NEPA depends on two factors: (1) whether obtaining more detailed information of the topic under consideration is "meaningfully possible" at the time and (2) how important it is to have the additional information at an earlier stage in determining whether or not to proceed with the project. 562 F.2d at 1378. With respect to the Deep Creek Area, the defendants claim that it is neither meaningfully possible nor important to obtain more detailed information unless and until site specific proposals from lessees create a need for more information.

In *State of California v. Block,* 690 F.2d 753 (9th Cir.1982), the Ninth Circuit Court of Appeals found that the Forest Service had violated NEPA by designating certain roadless areas under RARE II as "Non–Wilderness" without sufficient site-specific environmental analysis. Non–Wilderness designation precluded the areas from consideration for inclusion in the National Wilderness Preservation System for 10 to 15 years. The court found that the Forest Service's plan to respond to specific development proposals with further site-specific environmental studies was ineffective because:

[T]he 'critical decision' to commit these areas for nonwilderness uses, at least for the next ten to fifteen years, is 'irreversible and irretrievable'. The site specific impact of this decisive allocative decision must therefore be scrutinized now and not when specific development proposals are made.

690 F.2d at 763.

The defendants, in the case at bar, seek to impress upon the court that the scope of the Deep Creek Area project is such that it is not conducive to site specific analysis until individual applications for development are proposed. Specific analysis is required by NEPA, however, before the "critical decision" is made.

Although the agency does have discretion to define the scope of its actions, *Block*, 690 F.2d at 765, such discretion does not allow the agency to determine the specificity required by NEPA.

*City of Tenakee Springs v. Block*, 778 F.2d 1402 (9th Cir.1985).

█ The court concludes that it is not only meaningfully possible and important to discover the site specific consequences on the human environment of the Deep Creek Area before the critical agency decision is made, but NEPA mandates that course of action.

The "critical decision" for the Deep Creek Area is the decision to issue oil and gas leases in the first instance. The Ninth Circuit Court of Appeals, in *Thomas v. Peterson*, 753 F.2d 754 (9th Cir.1985), recently had occasion to elucidate when an EIS must address subsequent phases. In *Thomas*, the court held that road construction associated with timber sales was a connected action and must be studied in a single EIS. The court stated:

In *Trout Unlimited v. Morton*, 509 F.2d 1276 (9th Cir.1974), we addressed the issue of when subsequent phases of development must be covered in an environmental impact statement on the first phase. We stated that an EIS must cover subsequent stages when 'the dependency is such that it would be irrational, or at least unwise, to undertake the first

phase if subsequent phases were not also undertaken.' *Id.* at 1285.

753 F.2d at 759.

The first step in the oil and gas leasing process is obviously the issuance of the leases themselves. It would undoubtedly be "irrational, or at least unwise" to undertake a leasing program, if exploration and ultimate development were not only contemplated but possible. As the Ninth Circuit found in *Cady v. Morton*, 527 F.2d 786 (9th Cir.1975), a lessee's capital investments and contractual commitments are relevant to a determination of the interdependence of staged activities. 527 F.2d at 795.

(c) Cumulative Effects.

The rationale of *Cady v. Morton, supra,* is pertinent to the other crucial issue presented in the case *sub judice, i.e.,* cumulative effects. In *Cady*, the court stated:

... [I]t cannot be denied that the environmental consequences of several strip mining projects extending over 20 years or more within a tract of 30,786.45 acres will be significantly different from those which accompany [the single lessee's] activities on a single tract of 770 acres.

527 F.2d at 795.

The cumulative effects of several oil and gas operations in the Deep Creek Area will be "significantly different" than those of a single operation upon any one of the subject leases. "Obviously a comprehensive analysis of cumulative impacts of several oil and gas development activities must be done before a single activity can proceed." *Conner v. Burford*, 605 F.Supp. at 109; *see also, Trout Unlimited v. Morton*, 509 F.2d 1276 (9th Cir.1974). In that regard, "significantly" is defined by the Council on Environmental Quality to include the severity of the impact. A factor to be utilized in determining the severity in any cumulative impacts situation, is stated as follows:

[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action tempo-

rary or by breaking it down into small component parts.

40 C.F.R. § 1508.27(b)(7).

The foregoing conclusion is in accord with the unassailed principle that an EIS must be prepared at an early stage in the project's planning process in order to assure that the environmental impacts will be considered in the decision making process. The necessity for pre-leasing analysis of potential cumulative effects is clear, where the decision taken by the agencies is an irretrievable choice "between the two competing and mutually exclusive demands of wilderness use and development." *California v. Block*, 690 F.2d 753, 767.

The United States Supreme Court has interpreted the mandate of NEPA to require federal agencies to take a "hard look" at the environmental consequences of their decisions. *Kleppe v. Sierra Club*, 427 U.S. at 410 n. 21, 96 S.Ct. at 2730 n. 21. Review of the Deep Creek Area project reveals the agencies' intent to take a delayed look at the environmental consequences which may flow from oil and gas exploration and development in the Area. The defendants have initiated a pattern of procrastination, not examination, of environmental concerns. *Foundation for North American Wild Sheep v. U.S.*, 681 F.2d at 1181; *Jette v. Bergland*, 579 F.2d 59, 63 (10th Cir.1978). In *Foundation for North American Wild Sheep*, the Ninth Circuit Court of Appeals stressed that procrastination by the federal agencies with respect to environmental concerns is foreclosed by NEPA. 681 F.2d at 1181. In that case, the court concluded that the Forest Service's determination that the subject road would be closed, in the event of a forty percent reduction in the use of the area by the affected sheep, represented "an agency decision to act now and deal with environmental consequences later." *Id.* The forty percent figure used by the agency in *Foundation for North American Wild Sheep* is coincidentally analogous to the present defendants' use of a forty percent grade in slope as the threshold for the limit of leasehold surface occupancy. The conclusion that damage to the environment will not occur at slopes less than forty percent is not supported in the record.

The defendant agencies violated NEPA by failing to prepare an EIS for the Deep Creek Area oil and gas leasing program. Later site specific analysis and protective stipulations simply do not comply with NEPA's comprehensive mandate to make early informed decisions and research cumulative effects of major proposed actions.

### (2) The No Leasing Alternative.

NEPA requires that agencies set forth alternatives to a proposed action. An integral part of an EIS is the discussion and consideration of alternatives. 42 U.S.C. § 4332(2)(C)(iii). 42 U.S.C. § 4332(2)(E) requires agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." In the case at bar, the plaintiffs assert that the defendant agencies failed to sufficiently analyze the alternative of denial of all leases in order to preserve the Deep Creek Area for possible future wilderness designation by Congress.

The defendant agencies claim that the no-leasing alternative was considered, but that current policy, as reflected in provisions 2822.14b and 2822.46 of the Forest Service manual, required the decision to reject all leases to be based on "identified unacceptable and unavoidable conflicts with surface uses and resources." Because the EA did not find the "unavoidable conflicts," the defendants submit the no-leasing alternative was properly rejected. The plaintiffs, however, contend that the decision of the Secretary of Interior to lease the Deep Creek Area, based on the recommendations of the Forest Service and the BLM was defective because the agencies concluded that they could not base a decision to reject leases on wilderness preservation alone. The position asserted by the Secretary, to the effect that the Secretary is divested of the discretion to refuse to issue leases solely to protect wilderness characteristics, is, the plaintiffs submit, based on fatally flawed logic.

This court recognizes the broad scope of an agency's duty to study all reasonable alternatives. Appearing twice in the text of NEPA, the duty is more pervasive than the duty to prepare an EIS. *See, State of California v. Bergland*, 483 F.Supp. 465, 488 (E.D.Cal.1980), modified on appeal, *sub nominee, State of California v. Block, supra.* In the context of the Deep Creek Area leases, the agencies erred by failing to prepare an EIS which developed alternatives. The alternatives discussed must include the no-leasing alternative. With the knowledge that oil and gas activities will potentially preclude wilderness preservation for at least a generation and, therefore, wilderness designation:

> ... the promise of a site specific EIS in the future is meaningless if later analysis cannot consider wilderness preservation as an alternative to development.

*California v. Block*, 690 F.2d 753 at 762, 763 (9th Cir.1982).

The analysis of the wilderness preservation/no leasing alternative is necessary at a time when that alternative is still viable, a time which is limited to the pre-leasing stage. Contrary to the assertion of the defendant agencies, the mere listing of the no-leasing alternative without any meaningful consideration, will not suffice to satisfy the mandate of NEPA.

### C. *Regulatory Violations.*

■ The plaintiffs contend that by leasing the Deep Creek Area without an EIS the defendant agencies violated their own regulations. The preparation of the Deep Creek Area EA and its Finding of No Significant Impact, the agencies submit, satisfy the requirements of their regulations. The court rejects the defendants' position.

The Forest Service's regulations, which are identical to those promulgated by the Council on Environmental Quality, require the preparation of an EIS for the Deep Creek Area leasing. 40 C.F.R. § 1508.27(b) lists several factors to be utilized in determining the intensity of an action's impact on the human environment. Included in the list is the degree to which the effects on the quality of the human environment are likely to be highly controversial, and the cumulative effect of several oil and gas

development activities. 40 C.F.R. §§ 1508.-27(b)(4) and (7). The effect on the Deep Creek Area which would be occasioned by oil and gas exploration and development is a highly controverted issue.

An agency is bound by the terms of its own regulations. *Foundation for North American Wild Sheep v. U.S.*, 681 F.2d at 1182. Therefore, to the extent that the Forest Service failed to reach a finding of significant impact and failed to prepare an EIS, it violated its own regulations.

### D. *The Endangered Species Act.*

■ Finally, the plaintiffs assert the defendant agencies violated the Endangered Species Act by failing to gather species and habitat data sufficient to make an informed biological assessment of the effects of leasing the Deep Creek Area.

Under the ESA, all agencies must ensure that their actions are not "likely to jeopardize the continued existence of any endangered species, or threatened species, or result in the destruction or adverse modification" of the cultural habitat of such species. 16 U.S.C. § 1536(a)(2). In order to effectuate this mandate with respect to the Deep Creek Area, the Forest Service consulted with the Fish and Wildlife Service which, in turn, conducted a biological assessment to determine the existence of threatened or endangered species in the Deep Creek Area. 16 U.S.C. § 1536(b); 50 C.F.R. § 402.04. The Fish and Wildlife Service found that four species protected by ESA, *i.e.*, the grizzly bear, the gray wolf, the peregrine falcon, and the bald eagle, were known to use, or have essential habitat in, the Deep Creek Area, although their presence or absence was not conclusively determined. The issuance of oil and gas leases, however, was found not likely to jeopardize these species or their cultural habitat. The biological opinion that the Deep Creek Area leasing would not violate ESA was limited to lease issuance because data and information for all stages of activity was obviously not available. The agencies take the position that further study will be conducted on the effects of each

step of the oil and gas development process as they arise.

The plaintiffs submit that the BLM did not make an informed decision with respect to ESA's mandates. In support of their contention, the plaintiffs cite language from the letter of the Fish and Wildlife Service pertaining to the Deep Creek Area, which warns of conflicts where insufficient investigation occurs:

> Leasing with little or no information on key habitat components and use patterns for the listed species in the Deep Creek Area is setting the stage for possible future conflicts between energy development and the conservation of endangered and threatened species. Early identification of the potential conflict areas so that sound planning on a regional basis can be initiated would provide a more positive approach.

The leading ESA case, *TVA v. Hill,* 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978), strictly construed the language of the Act in enjoining the 80% complete Tellico Dam Project after the discovery of the endangered snail darter.

> The pointed omission of the type of qualifying language previously included in endangered species legislation reveals a conscious decision by Congress to give endangered species priority over the 'primary missions' of federal agencies.

437 U.S. at 185, 98 S.Ct. at 2297.

Clearly the "primary missions" of oil and gas exploration and development must give way to affirmative investigation of "potential conflict areas." Defendants claim the *TVA* facts are substantially different in that the snail darter and its habitat faced certain eradication. The intent of ESA and the principles of *TVA,* cannot, however, be so narrowly construed. The Supreme Court in *TVA* clearly expressed the broad mandate to preserve species, citing the interpretation of Representative Dingell, House anager of the bill, of the mandatory nature of § 7:

> Another example ... [has] to do with the continental population of grizzly bears which may or may not be endangered, but is surely threatened.... Once this bill is enacted, the appropriate Secretary, whether of Interior, Agriculture or whatever, *will have to take action,* to see that this situation is not permitted to worsen, and that these bears are not driven to extinction. The purposes of the bill included the conservation of the species and of the ecosystems upon which they depend, and *every agency of government is committed* to see that those purposes are carried out.... [T]he agencies of Government can no longer plead that they can do nothing about it. *They can, and they must. The law is clear.* 119 Cong.Rec. 42913 (1973). (Emphasis supplied.)

437 U.S. at 183, 184, 98 S.Ct. 2296, 2297.

The agency planning process is the time frame for which NEPA and ESA have their most efficient consequences. We need not proceed to 80% completion of a major oil and gas development project only to force termination due to discovery of the destruction of threatened and endangered species or their cultural habitat. The defendants seek court approval of an ESA compliance scheme of responding to specific activity proposals and enforcing restrictive stipulations where threats arise. This court, bound by the priority of ESA over the primary missions of the agencies, cannot approve such a plan of action. Defendants assert that their assessment encompasses "the best scientific and commercial data available" and that, therefore, their investigation is sufficient. 16 U.S.C. § 1536(a)(2). The agency, however, cannot propose a project so expansive and comprehensive as the Deep Creek Area leasing project, and then claim that the "available" data is sufficient. The Fish and Wildlife Service's suggestions of "early identification" and "sound planning on a regional basis" are good advice, advice which is more formally expressed in *TVA v. Hill, supra,* and the ESA itself.

The agency is also required to conserve threatened and endangered species to the extent that they are no longer threatened and endangered. *Carson–Truckee Water Conservancy District v. Clark,* 741 F.2d 257 (9th Cir.1984). "The plain intent of Congress in enacting this statute was to halt and *reverse* the trend toward species

extinction, whatever the cost." *TVA v. Hill,* 437 U.S. 153, 184, 98 S.Ct. 2279, 2297 (emphasis added).

## III. CONCLUSION

In *Conner v. Burford,* 605 F.Supp. 107 (D.Mont.1985), this court rejected post-leasing, site-specific environmental assessments as violative of NEPA and post-leasing, site-specific biological assessments as violative of the ESA. The record in the case *sub judice* compels the same result with respect to leasing in the Deep Creek Area. The cumulative impacts of several separate oil and gas exploration and development activities in the Deep Creek Area have not been properly assessed. As wilderness preservation will no longer be a viable alternative in the Deep Creek Area after oil and gas exploration and/or development begins, neither, certainly, can conservation and promotion of threatened and endangered species.

Therefore, under the provisions of 5 U.S.C. § 706, the actions of the defendant agencies, allowing the issuance of oil and gas leases in the Deep Creek Area, are HEREBY SET ASIDE. The defendant agencies are enjoined from making further recommendations to lease and issuing leases pending compliance with NEPA, agency regulations, and the ESA.

NOW, THEREFORE, IT IS HEREBY ORDERED that defendants' and intervenors' motion for summary judgment is DENIED.

IT IS FURTHER ORDERED that plaintiffs' motion for summary judgment is GRANTED.