**SURFRIDER FOUNDATION, Plaintiff,**

v.

**John DALTON, United States Secretary of the Navy; Charles C. Krulak, Commandant of the United States Marine Corps; Charles W. Reinke, Commanding General of the Camp Pendleton Marine Corps Base; Colonel John R. Todd; and Colonel W.A. Spencer, Defendants.**

No. Civ. 97–1364–B (AJB).

United States District Court, S.D. California.

Jan. 13, 1998.

---

Thomas P. Davis, Nokes, Davis & Quinn, Laguna Beach, California, for plaintiff.

Tom Stahl, Asst. U.S. Atty., and Richard G. Walls, Western Bases, U.S. Marine Corps, for defendants.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTIONS FOR A PRELIMINARY INJUNCTION AND FOR SUMMARY JUDGMENT

BREWSTER, District Judge.

This matter came on regularly for hearing on the parties' cross-motions for summary judgment. After careful consideration of the papers filed by both parties, and of the arguments made by their respective counsel before this Court on December 22, 1997, and January 9, 1998, the Court hereby grants Defendants' motion for summary judgment and denies Plaintiff's motions for a preliminary injunction and for summary judgment.

### I. Case Type and Jurisdiction

Plaintiff is suing the Secretary of the Navy and officers of the United States Marine Corps (USMC), seeking a declaration that the Defendants have failed to prepare an environmental impact statement regarding proposed military housing construction in violation of the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4321 *et seq.* The Court has federal question jurisdiction over this NEPA action under 28 U.S.C.

§ 1331, and as a citizen suit for review of a final agency action under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* Plaintiff also alleges that Defendants failed to comply with the mandates of Executive Order 11990 regarding the taking of wetlands.

## II. Factual Background

The Surfrider Foundation ("Plaintiff") is a non-profit, conservation organization dedicated, in its words, to the preservation and protection of the environment and natural resources of San Diego County and of the world. Defendants, sued only in their official capacities, are Secretary of the Navy John H. Dalton; Marine Corps Commandant General Charles C. Krulak; Charles W. Reinke, Commanding General of Camp Pendleton United States Marine Corps Base ("Camp Pendleton"); Colonel John Todd, Chief of Staff at Camp Pendleton; and Colonel W.A. Spencer, Assistant Chief of Staff, Facilities, at Camp Pendleton.

This suit focuses on a 32–acre area of land ("the site") located on the northern coast of Camp Pendleton just south of the San Diego County–Orange County boundary.[1] The site, sometimes referred to as San Mateo Point or the "Loran" site, is located on the shoreline between southern San Clemente and San Onofre State Beach (SOSB), west of Interstate 5.[2] The site is located on a coastal bluff that overlooks the beach at San Onofre. SOSB is used extensively for recreation and is well-known among surfers for its "famous" and "historic" Trestles surfing area. A railroad line runs to the west of the site near the shoreline, crossing the San Mateo Creek by a bridge that spawned the name Trestles. The adjacent area north of the site in Orange County is extensively developed.

San Mateo Point became a part of Camp Pendleton in 1942, but was transferred to the Coast Guard in 1963. The Coast Guard maintained several buildings and an asphalt parking lot on the site. Administrative Record ("AR") 1:5:13.[3] Administration and support buildings and a helicopter landing pad were later constructed in conjunction with then-President Nixon's visits to his San Clemente home, the "Western White House," which was located immediately north of the site.[4] Some of the buildings on the San Mateo Point site were used by Nixon to conduct Presidential business, although it appears that little of the Nixon-era structures remain.

The state beach was created in 1972, providing legal public access to the Trestles surfing spot and the beach. The 2,019 acre park is leased by the USMC to the California Department of Parks and Recreation ("DPR"), and surrounds the site on three sides. The Coast Guard's Loran station ceased operations at the site in 1978. The Coast Guard apparently gave serious consideration to opening the land to a private hotel developer in exchange for off-site services, or in the alternative, to keep the site for exclusive recreation use by its members. The Marine Corps soon began efforts to reacquire the property under the excess property disposition process. DPR expressed a strong interest in acquiring the site to provide better access to the Trestles area. AR 1:34:99.

In 1985, the USMC elicited the assistance of DPR and local citizens' groups, including Plaintiff, in its efforts to reacquire the site. Internal DPR memoranda from March 1985 report that the USMC encouraged DPR to make a "strong effort" to lobby for the site to

1. The Administrative Record indicates that the original tract transferred from the Marine Corps to the Coast Guard was 41.94 acres. The marine Corps' current plan involves construction on 32 of those acres. A small portion of the original tract was dedicated for roads and other uses, and a Coast Guard lighted landmark point will remain on the southwestern 0.40 acres. Another 5 to 7.5 acres on the southeastern edge are vegetated slope descending to San Mateo Creek.

2. The Coast Guard maintained a Loran radar station on the site from 1963 to 1978.

3. Citations to the Administrative Record indicate volume number:document number:page number(s). The Administrative Record in this case consists of 64 volumes, 2,223 documents, and 16,391 pages. Judicial review of agency action generally is limited to review of the administrative record 5 U.S.C. § 706.

4. The Nixon tract was sold in 1979 and subsequently subdivided. See AR 1:37, 2:38.

be transferred to the USMC to improve relations between the USMC and DPR. AR 2:44:325–328. At a meeting on April 4, 1985, the USMC apparently represented that if it could secure the site it would lease the site to the DPR. AR 2:45:329. In September 1985, Plaintiff sent a letter to southern California Congressional representatives urging the transfer of the site to the USMC so that it could "remain in the public domain as a valuable public resource." AR 2:57:372.

Plaintiff alleges that the USMC only revealed its intentions to construct housing until after the site was officially transferred. The USMC had at least privately identified the site for potential housing construction by 1980. AR 1:35:105. Camp Pendleton reports a chronic housing shortage for enlisted Marines, and to a lesser extent, for officers. Marines stationed at Camp Pendleton face high costs-of-living off base, particularly in rapidly-growing southern Orange County. Therefore, many Marines who work in the northern portion of the base live to the south and face long commutes each day along Interstate 5. The USMC is concerned about effects on morale. Furthermore, the construction of pleasant, affordable homes on a coastal bluff overlooking the Pacific Ocean would help Camp Pendleton to attract junior officers.

In January 1986, internal USMC memoranda indicated that it was no longer the intent to lease the site to DPR, but to construct military housing that would "take advantage of the natural aesthetics/ideal location inherent with the site and provide affordable housing for Marines in a geographic area completely void of such assets." AR 2:69:399. A subsequent report noted that constraints such as military operations, topography, water supplies, and other issues severely limited their options for on-base housing locations, and that it did not want to use property that could have military use when a property such as San Mateo Point, which is not useful for most military exercises, might be available. AR 3:76:411–429. The report briefly listed some advantages of the site: minimal site development costs, proximity to base resources such as school and commissary, available ground water, etc. *Id.* at 421.

In August 1987, all necessary federal approvals were cleared and San Mateo Point was transferred from the Coast Guard to the USMC. AR 3:86:481–488. In January 1988, the USMC declined DPR's offer to lease the site, stating that the site was intended for military family housing, and in the interim would be used for military recreation purposes. AR 4:96:507, 4:101:513.

The USMC began proceedings under NEPA to construct housing at San Mateo Point in 1990, Project history from that date forward is discussed below.

### III. Standard of Review and Procedural Background

#### A. Legal Framework of NEPA

The purpose of the NEPA is set forth in its opening section: "To declare a national policy which will encourage productive and enjoyable harmony between man and his environment, to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation; and to establish a Council on Environmental Quality." 42 U.S.C. § 4321.

NEPA "does not mandate particular substantive results, but instead imposes only procedural requirements." *Laguna Greenbelt, Inc. v. United States Dep't of Transp.,* 42 F.3d 517, 523 (9th Cir.1994). NEPA requires an agency to take a "hard look" at the potential environmental consequences of proposed projects before taking action. *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.,* 462 U.S. 87, 97, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983). NEPA's "action-forcing" provision authorizes, and requires, federal agencies to consider the environmental consequences of their actions, and to prepare an environmental impact statement (EIS) for any major federal action that significantly affects the quality of the human environment. 42 U.S.C. § 4332(2)(C).

The regulations promulgated by the Council on Environmental Quality ("CEQ") implement the directives and purpose of NEPA

and provide direction for an agency determination of whether to prepare an EIS. 40 C.F.R. §§ 1500–1508. NEPA also requires federal agencies to develop their own methods and procedures in regard to environmental analysis. 42 U.S.C. § 4332(2)(B). The Navy's NEPA regulations, which substantially reflect the CEQ regulations, are found at 32 C.F.R. § 775. "The provisions of [NEPA] and these regulations must be read together as a whole in order to comply with the spirit and letter of the law." 40 C.F.R. § 1500.3. The regulations have been enacted in such a way as to remove from the ambit of judicial review any agency decision which meets the requirements of the regulations. The purpose of an EIS is to ensure that the agency is fully informed as to the environmental consequences of the proposed action and any measures that might be taken to mitigate those consequences. *Seattle Community Council Federation v. Federal Aviation Administration*, 961 F.2d 829, 832 (9th Cir. 1992); *LaFlamme v. FERC*, 852 F.2d 389, 398 (9th Cir.1988).

An EIS must be prepared when an action is (1) federal, (2) major, and (3) one that would significantly affect the quality of the human environment. The parties in this suit do not dispute that the proposed action is both federal and major for the purposes of NEPA. CEQ regulations require the preparation of an EIS when the proposed agency action is one which "normally requires an environmental impact statement," 40 C.F.R. § 1501.4(a)(1), and bar consideration of an EIS for certain "categorical exclusions." 40 C.F.R. § 1501.4(a)(2).[5] When, as in this case, neither of these provisions apply and when the impact of a proposed action is unclear, the agency must prepare an environmental assessment (EA) to determine whether the proposed project would significantly affect the quality of the human environment. Based on the significance determinations made in the EA, an agency either must decide that an EIS is required or issue a Finding of No Significant Impact (FONSI). 40 C.F.R. § 1501.4(c, e).

An EA should be a "concise public document" that serves to: "(1) Briefly provide sufficient evidence and analysis for determining whether to prepare an [EIS or FONSI]; (2) Aid an agency's compliance with [NEPA] when no [EIS] is necessary; [and] (3) Facilitate preparation of [an EIS] when one is necessary." 40 C.F.R. § 1508.9(a). The EA "[s]hall include brief discussions of the need for the proposal, of alternatives as required by [NEPA] section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. § 1508.9(b). The alternatives analysis of § 102(2)(E) requires agencies to "study, develop, and describe appropriate alternatives to recommend courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E).

Because the environmental effects of the proposed major federal construction project were unclear, the Marine Corps was required to prepare an EA. Navy regulations require that the Commandant of the Marine Corps ensure that subordinate officers conduct EA analysis in compliance with Department of Defense (DOD) and CEQ NEPA regulations. 32 C.F.R. § 775.4(c).

**B. Procedural Background**

In January 1990, the USMC organized an EA review committee for the proposed construction of fifty company-grade officer housing units at San Mateo Point. Two alternative "backup" sites were included "because of potential community opposition" to the San Mateo Point site. AR 5:152:685. The alternative locations were both in the southern half of the base: the Del Mar site near Oceanside, California, and the O'Neill Heights site inland near the Naval Hospital.

The first Final EA, issued in September 1990, concluded that the proposed construction would not have any unavoidable significant environmental effects, and therefore recommended the long-standing preferred option, San Mateo Point. However, the USMC's inability to secure an agreement

---

**5.** Navy actions that are categorically excluded from EIS requirements are listed in 32 C.F.R. § 775.6(f). Defendants have not suggested that the project falls within these exclusions.

with the City of San Clemente for water and sewer hookups to the site forced the selection of the Del Mar location in January 1991. AR 8:248:1525. Officer housing was later constructed on that site.

While DPR again approached the USMC about lease of the site and while some consideration was given to selling the site to developers in exchange for construction services, the USMC continued to aspire to construct officer housing at San Mateo Point. In 1993, when funding for an additional 76 units of housing became available, USMC reached an agreement with the Tri–Cities Municipal Water District that would ensure the provision of water and sewer service to San Mateo Point when needed. AR 9:282:1723. After proceeding for one year to revise and update the 1990 EA, a decision was made to prepare a new EA to more thoroughly evaluate the proposed San Mateo Point project. The draft EA, completed in March 1996, was distributed to numerous government agencies and citizens groups who were invited to submit comments. See, e.g., AR 34:1201:8063. All comments received answers and were included in the Final EA.

The draft EA was also submitted to the California Coastal Commission (CCC) pursuant to 15 C.F.R. § 930 *et seq.*, which requires federal coastal development projects to comply with state coastal management programs to the maximum extent practicable. In August 1996, the CCC rejected the USMC's bid for a Consistency Determination on the basis that there might be other suitable alternatives within the 120,000 acre base, and because of concerns about the visual impact of the project from the beach. As a result of this vote, the USMC modified the site plan by eliminating 8 units and increasing clustering so that the project would be pushed further back from the bluff. The revised plan also provided for enhanced landscaping to screen the project from viewers on the beach. In October 1996, the Commission awarded a Consistency Determination to the project. AR 53:1912:13130. The CCC's concerns about alternatives analysis are addressed separately in Part V of this Order.

The final EA, a 375–plus page document, was issued in January 1997. Upon review of the document, the Commanding General of Camp Pendleton issued a FONSI on January 24, 1997. In July 1997, Plaintiff filed its complaint for declaratory and injunctive relief, alleging that the EA and FONSI prepared by Defendants are inadequate under law, and that the USMC's decision not to prepare an EIS was arbitrary and capricious. Pursuant to a stipulated briefing agreement, the parties have submitted cross-motions for summary judgment. Plaintiff also has moved for a preliminary injunction to postpone construction pending the outcome of this action.

### C. Standard of Review for USMC's Failure to Prepare EIS

While NEPA does not explicitly provide for judicial review over agency decisions, courts have exercised such review since the D.C. Circuit's landmark decision in *Calvert Cliffs' Coordinating Committee, Inc., v. United States Atomic Energy Com'n.*, 449 F.2d 1109 (D.C.Cir.1971): "Section 102 of NEPA mandates a particular sort of careful and informed decisionmaking process and creates judicially enforceable duties. The reviewing courts probably cannot reverse a substantive decision on its merits, under Section 101, unless it be shown that the actual balance of costs and benefits that was struck is arbitrary or clearly gave insufficient weight to environmental values. But if the [agency] decision was reached procedurally without individualized consideration and balancing of environmental factors—conducted fully and in good faith—it is the responsibility of the courts to reverse." *Id.* at 1115; cited with approval in *Jicarilla Apache Tribe of Indians, et al. v. Morton,* 471 F.2d 1275, 1281 (9th Cir.1973).

The proper standard of review has evolved since those early cases. Two standards govern the review of an agency's NEPA actions. Factual disputes, which implicate substantial agency expertise, are reviewed under the arbitrary and capricious standard of § 706(2)(A) of the Administrative Procedure Act. *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 376–77, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989), *Greenpeace Action v. Franklin,* 14 F.3d 1324,

1330–31 (9th Cir.1992). Legal disputes are reviewed under the reasonableness standard. *Alaska Wilderness Recreation & Tourism Ass'n v. Morrison,* 67 F.3d 723, 727 (9th Cir.1995).

■ A challenge to an agency decision to issue a FONSI generally involves disputes of fact and not law. In this case, Plaintiff disputes the USMC's factual findings that the environmental effects of its proposal would not be significant or could be mitigated. Therefore, the arbitrary and capricious standard of *Marsh* applies. See *Greenpeace,* 14 F.3d at 1330–1331.[6]

■ In determining whether an agency's action is arbitrary and capricious, a court must consider whether the "agency has taken the requisite 'hard look' at the environmental consequences of the proposed action, carefully reviewing the record to ascertain whether the agency decision is founded on a reasoned evaluation of the relevant factors." *Greenpeace,* 14 F.3d at 1332. (internal quotation omitted). "This inquiry into the facts is to be searching and careful." *Id.* (citation omitted). "[A]n agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Id.* "Once we are satisfied that an agency's exercise of discretion is truly informed, we must defer to that informed discretion." *Id.* (internal quotation omitted). Judicial review of a NEPA agency action is generally limited to review of the administrative record. *Environmental Coalition of Ojai v. Brown,* 72 F.3d 1411, 1414 (9th Cir. 1995) (citing 5 U.S.C.A. § 706).

■ The Court may reverse an agency decision under the arbitrary and capricious standard only if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an impor-

tant aspect of the problem, offered an explanation of the problem that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or be the product of agency expertise. *Dioxin/Organochlorine Ctr. v. Clarke,* 57 F.3d 1517, 1521 (9th Cir.1995). Agency decisions will be reversed only when there has been a "clear error of judgment." *Marsh,* 490 U.S. at 378.

## IV. Analysis: Significant Impacts

*Greenpeace* requires that agencies take a "hard look" at the "relevant factors." *Greenpeace,* 14 F.3d at 1332. The CEQ regulations spell out "context" and "intensity" factors agencies should consider in their determination of whether a proposal will "significantly" effect the human environment. Plaintiff alleges that the EA fails to demonstrate adequate consideration of the context of the project and five intensity factors, defined by CEQ regulation § 1508.27 as follows:

"Significantly" as used in NEPA requires considerations of both context and intensity:

(a) Context. This means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality. Significance varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole. Both short- and long-term effects are relevant.

(b) Intensity. This refers to the severity of impact. Responsible officials must bear in mind that more than one agency may make decisions about partial aspects of a major action. The following should be

---

**6.** Prior to *Greenpeace,* the Ninth Circuit reviewed an agency's decision not to prepare an EIS under a "reasonableness" standard. See, e.g., *Sierra Club v. United States Forest Service,* 843 F.2d 1190, 1192 (9th Cir.1988). Although the Circuit continued to employ a reasonableness standard in some cases after *Marsh* was decided in 1989, the Circuit in *Greenpeace* (1992) wrote that *Marsh* "requires us to reexamine this practice." "When an agency has attempted to comply with

NEPA's dictates and an aggrieved party challenges its determination that the proposed action does not warrant an EIS, the case often presents 'a factual dispute the resolution of which implicates substantial agency expertise' and 'requires a high level of technical expertise.' In such a case, it would contravene *Marsh* to review the agency's determination under a standard other than 'arbitrary and capricious.' " *Greenpeace,* 14 F.3d at 1330 (quotations omitted).

considered in evaluating intensity: ... (3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas. (4) The degree to which the effects on the quality of the human environment are likely to be highly controversial. (5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks. (6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration. (7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.... 40 C.F.R. § 1508.27.

Plaintiff also argues that "the Corps made a decision to build this Project at San Mateo Point and then went about the business of preparing environmental assessments to justify its decision. The Administrative Record also reveals that at no time did the Corps consider the preparation of an environmental impact statement as required by NEPA, but instead designated a critical path that would lead in only one direction—to a finding of no significant impact." However, an agency's intention or predisposition in drafting an EA is irrelevant if the EA itself ultimately satisfies requirements of NEPA. *Laguna Greenbelt,* 42 F.3d at 524, n. 4. If the USMC did not conduct its environmental analyses in good faith, then it should be evident that the factual conclusions of those studies were arbitrary.

Before addressing specific alleged deficiencies in USMC analysis, it is important to recognize that an agency may issue a FONSI when potentially significant impacts can be mitigated by specific remedial measures. So long as significant measures are undertaken to mitigate the project's effects, it is not necessary that they completely com-

pensate for adverse environmental impacts. *Friends of Endangered Species v. Jantzen,* 760 F.2d 976, 987 (9th Cir.1985).

**A. Local and Regional Impacts; Proximity to Park Lands and Wetlands**

Plaintiff alleges that the USMC failed to adequately review the context of a proposed action and the third of the intensity factors, "unique characteristics of the geographic area such as proximity to ... park lands [or] wetlands...." 40 C.F.R. §§ 1508.27(a), 1508.27(b)(3). The Court must determine whether the USMC acted arbitrarily or capriciously when it decided not to prepare an EIS in light of these charges.

**1. Effect on San Onofre State Beach park lands**

The EA states: "The [project] would not impact San Onofre Beach State Park and will have no effect on the lease agreement between the Department of the Navy and the California Department of Parks and Recreation." AR 62:2152:15640. DPR's concerns are best reflected in its comments to the draft EA, and by the USMC's responses. AR 62:2152:15859–15864.

DPR first expressed concerns about the viewshed impacts. AR 62:2152:15859. The EA concedes that San Mateo Point is clearly visible from the park's public access area. AR 62:2152:15668. However, the EA concludes that the housing would not significantly affect park views because of "the distance involved, differences in elevation, and construction, design and mitigation measures which include a tree planting program that will screen the housing units." Computer-generated before-and-after pictures of beach views (which were suggested by DPR in its comments) included in the EA suggest that the effects of the housing would not be significant, particularly in light of the already-existing train tracks, old San Mateo Point buildings, and distant views of San Clemente. AR 62:2152:15677. Furthermore, as discussed above, the visual impacts were further mitigated by increased setbacks from the bluff and vegetative shielding incorporated to mollify CCC concerns. Upon viewing the

photographs, the Court is persuaded that the determination that the visual impact is not significant, with mitigation, was not an arbitrary or capricious decision.

█ DPR next expressed concern about endangered species habitat degradation. Originally, DPR and others believed that the site might be home to several endangered or threatened species, including the coastal California gnatcatcher, least Bell's vireo, San Diego and Riverside fairy shrimp, tidewater goby, Pacific pocket mouse, and the southwestern willow flycatcher. AR 62:2152:15829. However, in July 1996, the USFWS issued a Biological Opinion and Conference Report (BO) on the San Mateo Project pursuant to § 7 of the Endangered Species Act of 1973, 16 U.S.C. § 1536. The USFWS found that the least Bell's vireo, southwestern willow flycatcher and Pacific pocket mouse are not found at the site. Noting with approval new mitigation measures proposed by the USMC since the draft EA, such as an expanded 100–foot buffer zone between the housing and bluff, the USFWS found that the project would not affect the coastal California gnatcatcher. The BO also approved the project's effects on the two species of fairy shrimp, subject to compliance with specified mitigation and compensation measures. AR 62:2152:15841–15850. The effects on the tidewater goby were cleared in an earlier BO.

The USMC may reasonably rely on the findings of the USFWS. Therefore, the conclusion in the FONSI that the project will not significantly effect endangered or threatened species cannot be said to have been arbitrary or capricious.

Other issues raised by DPR have generally been answered. The USMC has agreed to minimize impact by prohibiting cats and dogs. A fence will prevent residents from walking down to the beach except on approved pathways, and the fence will post interpretative signs educating residents about ecological sensitivities. The USMC adequately considered the environmental effects that its proposal would have on the adjacent park lands, and its FONSI determination in regard to effects on SOSB was neither arbitrary nor capricious.

### 2. Effect on Wetlands

█ Construction of the San Mateo Project would result in the loss of six vernal pools, representing 0.08 acres of wetlands ("on-site wetlands"). The project is also located near the 82–acre Trestles Wetlands Natural Preserve ("off-site wetlands").

Section 404 of the Clean Water Act generally requires the acquisition of a permit from the Army Corps of Engineers (ACOE) prior to a taking of any wetlands. 33 U.S.C. § 1344. In September 1997, the ACOE determined that the proposed USMC housing project complies with the conditions of nationwide permit NW26A, and that an individual § 404 permit is not required. The national permit only applies to wetlands reductions that "cause only minimal adverse environmental effects." 33 U.S.C. § 1344(e)(1).

The ACOE determination was issued after the FONSI, so it cannot directly support the USMC decision. However, the USMC could have reasonably relied on a letter sent by ACOE in January 1996 that the vernal pools "would most likely be covered under nationwide Permit 26A." The letter identified as the most important outstanding question for this determination the possible need for a § 7 determination by USFWS that the project would not jeopardize the continued existence of endangered or threatened species, a process that was in fact completed before the FONSI. AR 30:1067:6724–6726. This letter was cited in the EA at AR 62:2152:15694.

Furthermore, the ACOE finding is instructive because it was premised, essentially, on mitigation measures that were included in the EA or were in the process of being developed. As noted above, significant measures undertaken to mitigate a project's effects can justify a FONSI. *Jantzen,* 760 F.2d at 987. As part of the USFWS and ACOE determinations, the USMC agreed to a program of off-site protection, enhancement and management of fairy shrimp habitat. AR 62:2152:15695–15696. The ACOE also referred to continued compliance with the terms of the BO that the USFWS had issued in July 1996. Despite the minimal size and arguable quality of the affected on-

site wetlands, the USMC devoted substantial effort to evaluating and minimizing the net environmental effects on area vernal pool habitats. On these bases, the USMC's determination that the effects on the on-site wetlands were not significant was not an arbitrary or capricious decision.

■ From the record, it appears that the primary threat to off-site wetlands from the project involves surface runoff that may carry harmful substances brought to the area by the concentrated human presence. The USMC has developed an extensive mitigation and monitoring program to minimize potential harmful effects. The measures include a drainage system with detention basins to filter sediments and pollutants, a 100–foot vegetated buffer that will filter surface runoff, erosion control measures; and a best management practices program which includes regular street sweeping, restrictions on yard chemicals and auto maintenance, and an active inspection program. AR 62:2152:15609–15622. During construction, the contractor will develop a stormwater pollution prevention program pursuant to the NPDES regional General Industrial Permit in compliance with the Clean Water Act, 33 U.S.C. §§ 1365 *et seq.* These measures demonstrate that USMC was aware of the potential impact on off-site wetlands and made serious efforts to address them. The mitigation program was developed by their environmental staff and consultants using federal and state standards. The FONSI determination with regard to off-site wetlands was neither arbitrary nor capricious.

**B. Public Controversy**

■ The fourth criteria for intensity analysis is the "degree to which the effects on the quality of the human environment are likely to be highly controversial." 40 C.F.R. § 1508.27(b)(4). Plaintiff argues that substantial public controversy over the USMC

proposal mandates the preparation of an EIS. The Ninth Circuit has found that "[t]he term 'controversial' refers to cases where a substantial dispute exists as to its size, nature, or effect of the major federal action rather than to the existence of opposition to a use." *Foundation for North American Wild Sheep v. United States Department of Agriculture,* 681 F.2d 1172, 1182 (9th Cir.1982) (internal quotation and emphasis omitted). In *Wild Sheep,* the Circuit reversed a district court award of summary judgment for the defendant agency. The Court ruled that numerous responses from conservationists and others highly critical of the agency's FONSI rendered the project "highly controversial" and that therefore the decision not to prepare an EIS was plainly unreasonable (a reasonableness standard was used because the case predated *Marsh.*) *Id.* The Court found that the agency only made minor changes to its draft after receiving comments, and that the EA "did not respond in other than a conclusory fashion to the comments previously received." *Id.* at 1176, n. 15.

In the instant case, the USMC received eleven comments on its draft EA, but only four squarely objected to its finding of no significant impact: the U.S. Fish and Wildlife Service (USFWS), DPR, Plaintiff, and the Friends of San Mateo Creek.[7] Detailed, point-by-point answers were sent to each commentator. The USFWS' concerns have since been satisfied and it now supports the San Mateo Point site. The Court cannot definitively comment on the current views of DPR and Friends of San Mateo Creek.

Defendants argue that in view of approvals from USFWS, CCC, and ACOE, the project is not highly controversial, citing *Greenpeace,* 14 F.3d 1324. In *Greenpeace,* the agency was able to develop a consensus among parties who had originally filed formal comments concerning the proposal, while the plaintiff in

---

**7.** Three comments (the Regional Water Quality Control Board, the Orange County Vector Control District, and the San Diego County Department of Environmental Health) focused on the severe mosquito problem at the mouth San Mateo Creek. In response, the USMC announced plans to employ a USFWS-approved mosquito-control program in conjunction with the San Diego County Department of Environmental Health. AR 62:2152:15896. The final four responses (California DOT, CCC, school district, and the municipal water district) generally did not object to the overall conclusions, and their concerns and suggestions were successfully addressed and/or incorporated into the EA.

that case did not submit comments. The Court noted that it would not "characterize the agency's action as 'arbitrary' for failing to consider views [of the plaintiff] that were never presented to it." *Id.* at 1334, n. 13. The Court recognized that "where virtual agreement exists among local, state, and federal government officials, private parties, and local environmentalists, the criticisms of the plaintiff and its experts are not sufficient to demonstrate the existence of a public controversy." *Id.* at 1334 (internal quotations omitted).

The facts of this case are somewhere in between *Greenpeace* and *Wild Sheep.* Plaintiff and others have consistently opposed construction on San Mateo Point for years, and unlike the plaintiff in *Greenpeace,* Plaintiff participated in the EA comment process. Furthermore, approvals by the USFWS, CCC and ACOE alone should not be deemed to put to rest any controversy. The approval of each was required by some other regulation. If their acceptance precluded a determination of controversy, then the "highly controversial" intensity factor would not add anything to NEPA analysis, rendering 40 C.F.R. § 1508.27(b)(4) a "nullity." *Wild Sheep,* 681 F.2d at 1182.

A better model than either case is *Northwest Environmental Defense Center v. Bonneville Power Administration, et al.,* 117 F.3d 1520 (9th Cir.1997). In that case, the agency received numerous comments to its EA, some of which were opposed to its findings. The agency made changes to its proposal which mollified some, but not all, opponents. The Ninth Circuit was satisfied that the changes were "apparently to the satisfaction of *some* commentators who had expressed concern regarding adverse effects.... BPA's conclusion that the [changes] alleviated *most* of the concerns regarding the effect of entering into the NTSA was not arbitrary or capricious." *Id.* at 1536 (emphasis added). This finding suggests that an EIS is not required when an agency makes a good faith effort to satisfy the concerns of commentators, and, to at least some extent, succeeds. The USMC in the instant case answered all eleven comments, making several changes to its proposal and satisfying

many of the concerns. Therefore, the agency should not be required to prepare an EIS under 40 C.F.R. § 1508.27(b)(4).

Ultimately, Plaintiff is primarily opposed to the use of the site, rather than trying to controvert any particular finding in the EA. Courts have avoided equating controversy with opposition. "Otherwise, opposition, and not the reasoned analysis set forth in an environmental assessment, would determine whether an environmental impact statement would have to be prepared. The outcome would be governed by a 'heckler's veto.'" *North Carolina v. Federal Aviation Administration,* 957 F.2d 1125, 1133–1134 (4th Cir. 1992) (citations omitted).

Therefore, the USMC determination that the proposed housing at San Mateo Point is not "highly controversial" was not arbitrary or capricious.

### C. Cumulative Impact

The seventh intensity factor requires agencies to consider the impact of a proposed project cumulatively with all "past, present, and reasonably foreseeable actions" of any agency or person. 40 C.F.R. §§ 1508.7, 1508.27(b)(7). The Court will review the agency's decision in light of (1) the cumulative impact of development on the southern California coast and (2) the proposed Orange County Foothill Transportation Corridor.

#### 1. Southern California coastal development

■ The seventeen-mile coastline of Camp Pendleton represents the single largest relatively undeveloped stretch of coastline in southern California. Against this background the Court must consider *City of Carmel-by-the-Sea v. U.S. Dept. of Transportation,* 123 F.3d 1142, 1160–1161 (9th Cir.1997), in which the Ninth Circuit reversed a district court's award of summary judgment to the defendant solely on the grounds that its EIS failed to adequately consider cumulative impacts.

*Carmel* appears to require an agency to describe past projects with sufficient specificity to permit adequate review of their cumulative impact. The panel found the EIS'

references to "development projects" and "ongoing urbanization" inadequate, "particularly . . . in light of [acknowledgment] that the Carmel area has experienced 'substantial growth' over the last 30 years. . ." *Id.* at 1160. The EIS in that case listed several specific proposed development projects, but did not provide any "meaningful analysis of the cumulative impacts." *Id.* at 1161.

*Carmel* held that the EIS was inadequate even though Plaintiff in that case failed to challenge a specific cumulative effect that the EIS failed to consider. The Court ruled that the defendants "failed first" because the agency bore the original burden of conducting cumulative effects analysis.

*Carmel* leaves unclear the limits of this burden. Clearly an agency cannot evaluate the cumulative impact of every development project ever undertaken throughout the world. Still, the disappearance of California coastline habitat is a relevant factor in federal environmental policy, and it can be argued that NEPA demands a cumulative impact study in a case such as this one. However, the agency best in position to observe and regulate the cumulative effects on that coastline, the California Coastal Commission, awarded a Consistency Determination to the project as mitigated. As discussed elsewhere in this Order, the USMC made special efforts to bring the project within CCC regulations and to minimize negative impacts to the California coast. NEPA does not ask more.

### 2. Orange County Foothill Transportation Corridor

■ The Orange County Foothill Transportation Corridor is apparently conceived as an alternative inland toll highway that would decongest Interstate 5 and other Orange County highways. The route of this proposed highway has not been finalized, but one of two options would intersect Interstate 5 near San Mateo Point. Plaintiff alleges that the decision not to prepare an EIS was arbitrary and capricious because of the USMC's alleged failure to adequately evaluate the cumulative effects of the possible route for this highway and the housing project.

■ A project need not have received final approval to be "reasonably foreseeable." The term "reasonably" suggests that the agency must make a good faith effort to consider likely cumulative effects; an unreasonable exclusion of review of another project might demand the preparation of an EIS. The Orange County highway project appears to have substantial momentum and can arguably be said to be a reasonably foreseeable action even if it is never in fact constructed at either location.

■ However, even if the highway is reasonably foreseeable, it does not necessarily follow that all of its environmental impacts must be reviewed. It is not clear what cumulative effects of concern to the Plaintiff the highway and housing projects share. Traffic decongestion can only help the housing project. The environmental effects of the highway, if approved, will occur whether the housing is constructed or not. If anything, the highway would appear to more seriously effect the wildlands in the state park area east of Interstate 5, discussed in Part V of this Order. NEPA does not require an agency to review *every* reasonably foreseeable action; only those actions whose effects, when accumulated with those of the instant proposal, might have negative environmental effects not evident from the proposal when considered alone. The USMC is not required to consider reasonably foreseeable new rides at nearby Disneyland. An agency is not required to analyze each proposed project in the absence of some evidence as to why that *specific* project is relevant and would warrant individual cumulative effects analysis.

To the extent that the potential effects of the Foothill highway are known, the EA attempts to address them. AR 62:2152: 15588–15589, 15777–15784. While these sections do not provide any depth of analysis, it is not clear to the Court that any further effects of the proposed highway are sufficiently related and relevant to the proposed housing project to compel additional cumulative effects analysis in the EA. Therefore, the USMC's EA is not defective for want of cumulative effects analysis.

## D. Other Intensity Criteria

█ The fifth criteria for intensity analysis is the "degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks." 40 C.F.R. § 1508.27(b)(5). Plaintiff cites this category in its brief but does not develop an argument. The USMC is proposing to build residential apartments, hardly an unusual project. The environmental effects at the proposed site, while perhaps prioritized differently by some, are largely predictable. This criteria does not give cause for the USMC to prepare an EIS.

█ The sixth intensity criteria is the "degree to which the action may establish a precedent for future actions...." 40 C.F.R. § 1508.27(b)(6). Plaintiff has listed this criteria in its motion but has not developed an argument. The EA is highly site-specific to San Mateo Point. There is no indication that a judicial refusal to force the agency to complete an EIS in this project will enable the USMC to ratify future projects without complete adherence to NEPA. Therefore, this criteria does not give cause for the USMC to prepare an EIS.

## E. Conclusion: Was the FONSI arbitrary or capricious?

While Plaintiff cites several instances in which the Ninth Circuit has set aside an agency decision not to prepare an EIS, only in *Wild Sheep* did the court mandate reconsideration after the agency had prepared an environmental assessment. *Foundation for North American Wild Sheep v. United States Department of Agriculture*, 681 F.2d 1172, 1178 (9th Cir.1982). In *Wild Sheep*, the Forest Service's failure to address "certain crucial factors, consideration of which was essential to a truly informed decision whether or not to prepare an EIS," rendered its conclusion that no statement was necessary unreasonable. 681 F.2d at 1178. Unlike *Wild Sheep*, the record in this case reveals no complete failure to consider crucial factors. See *Greenpeace*, 14 F.3d at 1332.

The EA is a well-reasoned document that incorporates numerous environmental concerns. In many respects, this project represents a NEPA success story, because the final proposal includes numerous environmental improvements that might not have been realized without the lengthy NEPA process. The Court has found that the USMC has made adequate determinations about the context and intensity factors set forth in the CEQ regulations. Therefore, its decision not to prepare an EIS does not reflect a "clear error of judgment," and its FONSI does not warrant further review in the courts.

## V. Alternatives Analysis

█ Independent of its other mandates, NEPA requires agencies to "study, develop, and describe appropriate alternatives to recommend courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E). Alternatives analysis is both independent of, and broader than, the EIS requirement. *Bob Marshall Alliance v. Hodel*, 852 F.2d 1223, 1229 (9th Cir.1988). So long as there are unresolved conflicts about alternative uses of land, an agency must conduct an alternatives analysis even when a proposal has no significant environmental impact. The same alternatives analysis requirement, found at 42 U.S.C. § 4332(2)(E), applies whether a proposal has an enormous environmental impact or none at all. See *Id.* In *Bob Marshall*, the "unresolved conflict" was whether the proposal could later affect a site's suitability for wilderness designation, which is similar to the concern in the instant case about the potential inclusion of San Mateo Point into SOSB. Therefore, the fact that the USMC issued a FONSI does not relieve it of its obligation to evaluate feasible alternatives.

█ There are two distinct phases of alternatives analysis. First, the agency must choose from the universe of options a list of alternatives as "finalists" that it will study in detail. Second, the agency engages in a more rigorous environmental analysis of these selected finalists before making its ultimate decisions. NEPA regulations require an agency to "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the rea-

sons for their having been eliminated." 40 C.F.R. § 1502.14(a). The "rule of reason" guides both the choice of alternatives as well as the extent to which an agency must discuss each alternative. *City of Carmel–by–the–Sea v. United States Dep't of Transp.*, 123 F.3d 1142, 1154–55 (9th Cir.1997).

 If finalist alternatives are evaluated in reasonable depth, an agency is free to make any non-arbitrary choice among them, even to choose an alternative more environmentally harmful than other options. "If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by [NEPA] from deciding that other values outweigh the environmental costs." *Carmel*, 123 F.3d at 1159 (quotations omitted). However, if the agency unreasonably failed to include a viable alternative among its list of finalists, its alternatives analysis would be inadequate even if the selected site was clearly superior. While this juxtaposition may appear irrational at first, it reflects NEPA's role as a *procedural* statute. NEPA's primary purpose is to ensure that agencies incorporate environmental values as part of their decisionmaking. When finalist alternatives are subjected to rigorous environmental analysis, an agency becomes educated about the environmental effects of a project, and is then presumed to be able to make a reasoned and informed decision based ultimately upon the agency's expertise in its own field. In this case, for example, the USMC is not expected to prioritize environmental values above its military and operational needs, but it is required to become educated about environmental effects so that it may determine their proper weight. It is the agency, and not the courts, that have expertise in understanding agency objectives, and so courts will defer to such decisions so long as they were not arbitrary or capricious. On the other hand, when an agency has unreasonably decided not to study a potentially viable alternative, then a court must assume that the agency was unable to ade-

quately incorporate environmental values into its decisionmaking process. The purpose of NEPA cannot be achieved in such a void.

In this case, it is more convenient for the court to address the USMC's depth of analysis of its finalists first, and then move to address whether the choice of alternatives was reasonable.

## A. Finalist Alternatives

 From the universe of possible alternatives, the EA selected five finalists: (1) a 128–unit project at San Mateo Point; (2) a 120–unit project at San Mateo Point;[8] (3) a third San Mateo Point location to the west of the other two, described as the "Cotton Point" alternative; (4) the San Onofre alternative, located one mile southeast of San Mateo Point and east of Interstate 5; and (5) a No Action alternative.

The EA analyzed the following impacts for each of the five finalists: topography, geology, soils, and seismicity; hydrology and water quality; public health and safety; land use and planning; socioeconomics; schools; police and fire protection; aesthetics; biological resources; cultural resources; traffic and circulation; air quality; noise; utilities; and recreation. AR 62:2152:15600–15758. The USMC employed several professional consultants and its own experts to compile extensive analysis, and consulted numerous federal, state, and local agencies. Whatever anyone might say about the findings of this analysis, or the choice of finalists, it cannot be said that the depth of this analysis was unreasonably inadequate. Therefore, the USMC's alternative analysis is not inadequate for want of detailed, in-depth analysis of finalist alternatives.

## B. Choice of Finalists

 "The Environmental Impact Statement need not consider an infinite range of alternatives, only reasonable or feasible ones."[9] *Carmel*, 123 F.3d at 1154–55. An

---

8. The second alternative, a modified version of the first, was designed to satisfy the CCC's viewshed impact concerns. Most of the environmental effects of these two options are substantially similar.

9. These standards apply to EAs as well, since alternative analysis for both is governed by the same language in 42 U.S.C. § 4332(2)(E).

agency need only set forth those alternatives necessary to permit a "reasoned choice." *Jantzen*, 760 F.2d at 988 (citations omitted). The range of alternatives that must be considered need not extend beyond those reasonably related to the purposes of the project. *Laguna Greenbelt*, 42 F.3d at 524.

■■■■ NEPA does not require a separate analysis of alternatives which are not significantly distinguishable from alternatives actually considered, or which have substantially similar consequences. *Northern Plains Resource Council v. Lujan*, 874 F.2d 661, 666 (9th Cir.1989). A "detailed statement of alternatives cannot be found wanting simply because the agency failed to include every alternative device and thought conceivable." *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 551, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). Thus, an agency's consideration of alternatives is sufficient if it considers an appropriate range of alternatives, even if it does not consider every available alternative. *Headwaters, Inc. v. Bureau of Land Management*, 914 F.2d 1174, 1180–81 (9th Cir.1990). It should be noted that this flexibility is more important to an agency making a policy choice that involves theoretical alternatives, or a quantitative decision with an infinite range of potential numerical inputs, than to an agency in a case such as this one in which it must choose amongst a finite number of tangible pieces of property for a construction project.

■■■ Still, despite all of these limitations, an unreasonable failure to consider a viable alternative renders an alternatives analysis inadequate. *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1519 (9th Cir.1992).

Plaintiff alleges that the USMC unreasonably rejected viable alternatives, including, but not limited to, its proposed alternative as discussed below. Defendants argue that the rejected sites did not need to be analyzed because they had more serious negative consequences than those at San Mateo Point. They cite several circuit cases that have held that the range of alternatives that an agency must reasonably consider decreases as the environmental impacts of a proposal decreases. See, e.g., *Olmsted Citizens for Better Community v. United States*, 793 F.2d 201,

208 (8th Cir.1986). In a USMC response to the CCC, the Corps wrote that, "[w]hen compared to our proposal for the project at San Mateo Point, we do not believe the Surfrider Foundation's proposal is a viable alternative." AR 43:1562:10130. However, the Ninth Circuit has ruled that "the superiority of the preferred route is irrelevant to the reasonableness of the omitted, alternative route." *Citizens for a Better Henderson v. Hodel*, 768 F.2d 1051, 1057 (9th Cir.1985). The only question, then, is whether the rejection of sites not studied in detail was reasonable.

■■■ The first step in identifying feasible alternatives is to define the purpose of the proposed action. The USMC defined the primary purpose and need of the proposed action as the provision of company grade officer housing units on base to meet the existing demand for such housing in the northern portion of Camp Pendleton. AR 62:2152:15576–15578. While Plaintiff suggests that the officer housing shortage is overstated, and that the south base-north base commute is not unreasonable for southern California, courts generally defer to plausible agency determinations about the purpose and need of a given project. See, e.g., *Carmel*, 123 F.3d at 1155. The USMC is in a much better position than this court to evaluate and understand the needs of its officers and the effects of such on the state of the military. Agencies may not define the purpose of a project in unreasonably narrow terms so as to avoid consideration of alternatives. *Id.* However, the Court believes that the USMC may reasonably confine its search to the northern portion of a base as large as Camp Pendleton so that it may reduce the commuting burden and enable officers to live in closer proximity to their stations.

The EA states that all areas in the northern portion of the base were initially screened for consideration, and that all sites determined to be reasonable were carried forward for further analysis as formal alternatives. The EA claims that most land in the northern portion of the base is unsuitable because it is designated for live-fire and other training incompatible with residential zoning and/or they are mountainous and rugged.

Most support facilities such as commissaries, exchanges, schools, recreational facilities, etc., are located on the perimeter of the base near the coast for these same reasons, and it is ideal to locate residences near to these support facilities. Therefore, even while the northern portion is still a very large area, the Court accepts as reasonable the general proposition that much of the land is clearly unsuitable to satisfy the purpose and need of the proposed project.

However, two specific northern sites that were not selected as finalists warrant individualized consideration: (1) the agricultural outlease area and (2) the leased state park area east of Interstate 5 (the "east park" area). The EA mentions both sites briefly in a "considered but rejected" section. Unlike the finalist sites, depth of analysis is not the issue; instead, the Court must ask whether the summary rejection of these sites was unreasonable, such that the EA failed to consider a reasonable range of alternatives.

### 1. Agricultural Outlease Area

■■■ An area on the northern border of the base and east of Interstate 5 is currently outleased as agricultural land. The site was rejected because: (1) need to preserve site for future training purposes; (2) the site is the proposed location for a new wastewater treatment facility; (3) negative impacts on the aquifer underlying the site, which is an important element in a recent agreement with the Tri–Cities Municipal Water District to provide utilities to the base; (4) agricultural value; (5) the site is within the 100–year flood plain of San Mateo Creek, undermining federal policy to avoid such areas; (6) lack of existing roadways; and (7) a significant Native American archeological site. AR 62:2152:15586–15588. Upon this analysis, the decision not to include this site in the formal alternatives analysis was reasonable.

### 2. The "east park"

■■■ At its heart, this case is about a piece of land that Plaintiff and DPR want to add to San Onofre State Beach. It is obvious from the Administrative Record that DPR and supporting local citizens groups have coveted the San Mateo Point site for years.

DPR expressed interest in the site to various governmental agencies in the 1960s, 1975, 1979, 1985, 1987, 1990, 1991, 1994, and throughout the ongoing EA process. AR 17:499:3543.

As discussed above, the USMC leased 2,019 acres of its base to the California Department of Parks and Recreation (DPR) to create San Onofre State Beach (SOSB). While the park is best known for its coastal areas west of Interstate 5, it also includes approximately 1000 acres east of the interstate. The area is largely undeveloped except for a campground off Cristianitos Road, and the road itself, which appears to bisect the east park area in a northeasterly direction between San Mateo Creek and the county line. While there has been no formal proposal from the state, DPR and Plaintiff have long expressed strong interest in a lease-swap arrangement in which a portion of the state park lease would be released to the USMC for housing construction and San Mateo Point would be incorporated into the State Park lease.

The east park came into focus in early 1996 when Plaintiff, in consultation with DPR and the City of San Clemente, proposed its "Surfrider alternative" in which DPR would release 200 acres of its east park lease area on the west side of Cristianitos Road approximately 2 miles from Interstate 5. The area would be used to construct 154 housing units and a municipal golf course that offered preferred status for USMC officers. AR 30:1069:6728. Discussion of the east park was later fueled by CCC's concerns of the adequacy of the USMC's alternatives analysis.

The EA addresses the east park at AR 62:2152, 15588–15589, 15863–15864. The first factor described in the EA's determination that the location was unreasonable was the probability that the proposed Orange County Foothill Transportation Corridor highway will pass through or near the park. Plaintiff questions why this factor would eliminate the east park while the favored San Mateo Point site is located adjacent to Interstate 5. The USMC argues that the noise from the highways would be a much more

significant problem to the east than west because of ocean breezes.

The EA also states that the east park is unreasonable because it would threaten sensitive habitat for the endangered gnatcatcher and pocket mouse. When the Surfrider alternative was submitted to USFWS for study, the USFWS determined that the Surfrider alternative involved "substantial and serious drawbacks." AR 52:1887:12837. USFWS believed that development in the east park site might threaten sensitive habitats for endangered or threatened species. Unlike San Mateo Point, the park area features native habitat previously undisturbed by human construction.

The EA also discusses topographic and erosion problems in the east park. Significant portions of the park have steep grades unsuitable for construction. In addition, major portions of Plaintiff's "Surfrider alternative" are within the floodplain of San Mateo and Cristianitos Creeks. Finally, the EA expresses concern about potential impacts to Native American archeological sites in the east park, including the Cristianitos State Historic Site.

Many of the problems cited by the USMC are environmental concerns that could have been more fully developed in the EA, just as many of the same topics were addressed for San Mateo Point. Furthermore, each individual concern exposes problems with only a part of the east park. If the Court analyzed each justification individually, perhaps some questions could be raised about the adequacy of the USMC's analysis.

But when the problems of the east park are considered cumulatively, it becomes difficult to pinpoint a viable alternative within its boundaries. When Plaintiff attempted to do so, it selected a location that lies largely in a floodplain. When the CCC questioned the availability of alternatives in northern Camp Pendleton, the USMC presented to the Commission a series of maps which, when overlaid, illustrate their finding that no project

sites are available in the east park. See maps at AR 52:1091:13034–13038. The maps illustrate topographic constraints, mission constraints, land-use constraints, and natural resource constraints. The Commission was satisfied with the USMC presentation, finding that "no feasible alternative is available in the north base for the proposed project." AR 61:2116:15431. These maps are based upon Camp Pendleton's Master Plan, its Range Compatible Use Zone Program, its geographic information system (GIS) surveys, and the analysis of USFWS. The GIS surveys are digitized documents that draw from 60 years of aerial photographs, 70 years of water resource data, and 25 years of natural and cultural resource data. See AR 52:1091:12927, 12947–12955. Upon this record, and upon its own evaluation of these maps, the Court is satisfied that the USMC's rejection of the east park was not unreasonable. Therefore, the Corps satisfied NEPA's alternatives analysis requirement.

### VI. Executive Order 11990

 Construction of the San Mateo Project would impact six vernal pools, representing 0.08 acres of wetlands. Plaintiff alleges that the USMC project violates Executive Order 11990, which requires federal agencies that cannot avoid construction in wetlands to: "(1) make a finding that 'no practicable alternative' to construction exists, and (2) include 'all practicable measures to minimize harm to wetlands which result from such use.'" *Carmel*, 123 F.3d at 1167 (quoting 42 Fed.Reg. 26961).[10] The Ninth Circuit earlier defined practicable as whether "it is capable of attainment within relevant, existing constraints." *National Wildlife Federation v. Adams*, 629 F.2d 587, 592 (9th Cir. 1980). An agency may consider economic, environmental, and "other pertinent factors" in making these findings. *Carmel*, F.3d at 1167. Executive Order 11990 sets forth a more exacting standard for agency action than NEPA. *Id.* However, the Court still reviews agency action under the arbitrary and capricious standard of the Administra-

**10.** Plaintiff's brief cites *City of Carmel-by-the-Sea v. U.S. Dept. of Transportation*, 95 F.3d 892 (9th Cir.1996), in which the Ninth Circuit reversed a District Judge's award of summary judgment to government defendants accused of violating Executive Order 11990. In August 1997, the panel withdrew its earlier opinion and issued a new opinion affirming the District Court's 11990 determination. 123 F.3d 1142 (9th Cir.1997).

**1330**

tive Procedure Act. *Adams,* 629 F.2d at 592. Agencies are not required to prepare a separate document that explicitly illustrates compliance with 11990, so long as the project's consistency with the Executive Order can be reasonably inferred from the record.

While 11990's requirement that there exist "no practicable alternatives" may appear broader than NEPA's "reasonable range of alternatives" mandate, the arbitrary and capricious standard of review is less demanding than the reasonableness review discussed in Part V of this Order. Even if there were other viable alternatives for this project, most if not all would involve wetlands takings at least as significant as the minimal loss of 0.08 acres of apparently low-quality vernal pools at San Mateo Point. For example, the east park includes important wetlands and riparian habitat at the confluence of two waterways. In any event, the Court is satisfied that the USMC's finding that San Mateo Point is the only practicable alternative was neither arbitrary nor capricious.

The USMC's determination that all practicable mitigation measures are incorporated into the proposal is governed by *Carmel.* In *Carmel,* a road construction proposal called for the taking of 11.95 acres of riparian wetlands. The proposal included a mitigation plan, coordinated with and approved by, USFWS. The plan included 1:1 restoration of wetlands off-site, and other monitoring and mitigation measures. The Court found these measures sufficient to determine that the agency's determination that they included "all practicable measures" was not arbitrary or capricious. *Carmel* at 1167. *Carmel* more than satisfies the concern in the instant case about practicable mitigation measures. As discussed in Part IV.A(2) of this Order, the USMC has developed a commendable mitigation plan that includes factors cited in *Carmel* such as USFWS coordination and wetlands restoration. Therefore, the USMC's determination of compliance with the mitigation requirements of Executive Order 11990 was neither arbitrary nor capricious.

### VII. Conclusion

The Defendants have established that they are entitled to judgment as a matter of law.

Therefore, Defendants' motion for summary judgment is granted. Plaintiffs motion for summary judgment is denied, and its motion for a preliminary injunction is denied as moot.

IT IS SO ORDERED.